UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 JAN 29 PH 1: 19

LORETTA G. WHYTE
CLERK

SHAREEF COUSIN,                    )
                                   )
            Plaintiff,             )
                                   )
v.                                 )      Civil No. 00-0069
                                   )      Section R Mag. 2
ANTHONY SMALL, *et al.*            )      CIVIL RIGHTS under 42 U.S.C.
                                   )      §§ 1983, 1985, 1986 & 1988
            Defendants.            )
_____)

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2001 JAN 30 PM 1: 07
LORETTA G. WHYTE
CLERK

## PLAINTIFF'S MEMORANDUM IN REPLY TO THE MOTION TO DISMISS OR ALTERNATIVELY FOR SUMMARY JUDGMENT FILED BY DEFENDANTS CONNICK, KENNEDY, BERRY AND JORDAN

CLIVE A. STAFFORD SMITH
La. Bar No. 14444
636 Baronne Street
New Orleans, La. 70113
(504) 558-9867

Attorney for the Plaintiff

Fee_____
Process_____
X  Dktd_____
___ CtRmDep_____
· Doc.No._____

# TABLE OF CONTENTS

I.  THE DEFENDANTS CANNOT BEGIN TO MAKE AN ISSUE OF PRESCRIPTION
    ...................................................................... 1

II. THE MOTION SHOULD NOT BE HEARD OR FULLY BRIEFED UNTIL THE PARTIES
    HAVE HAD THE OPPORTUNITY TO COMPLETE SIGNIFICANT AND RELEVANT
    DISCOVERY ......................................................... 3

III. THERE ARE HIGHLY SIGNIFICANT ISSUES OF FACT THAT MUST BE RESOLVED,
     AND THERE IS CLEARLY NO BASIS FOR SUMMARY JUDGMENT .......... 4

    a.  WHILE THE ISSUE OF INDIVIDUAL IMMUNITY CANNOT BE SETTLED
        UNTIL DISCOVERY IS MORE ADVANCED, IT IS CLEAR THAT ACTS HAVE
        BEEN TAKEN BY THE DEFENDANTS THAT FALL OUTSIDE THEIR
        PROTECTIVE SHIELD ........................................... 6

    b.  IN THEIR MOTION TO DISMISS, DEFENDANTS DO NOT DISCUSS THE
        VAST MAJORITY OF THE CLAIMS, FOCUSING ALMOST EXCLUSIVELY
        ON THE SUPPRESSION OF FAVORABLE EVIDENCE ................. 9

        i.   THE KIDNAPING OF WITNESSES CANNOT BE A PROPER
             PROSECUTORIAL FUNCTION ............................. 10

        ii.  ILLEGALLY INTERROGATING WITNESSES CANNOT BE A PROPER
             PROSECUTORIAL FUNCTION ............................. 13

        iii. ILLEGALLY SEEKING OUT PEOPLE WHO WILL HELP PLACE
             SHAREEF COUSIN ON DEATH ROW ....................... 15

    c.  DEFENDANTS DO NOT DISCUSS THE VAST MAJORITY OF THE
        "SUPPRESSED EVIDENCE" CLAIMS, AND MAKE NO SHOWING THAT
        DISMISSAL SHOULD BE GRANTED .............................. 16

IV. ON THE ISSUE OF HARRY CONNICK'S LIABILITY, PLAINTIFF VIGOROUSLY
    DISPUTES THE "FACTS" SET FORTH IN THE DEFENDANTS' PLEADING AND
    AFFIDAVITS ....................................................... 18

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SHAREEF COUSIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 00-0069 |
| | ) | Section R Mag. 2 |
| ANTHONY SMALL, *et al.* | ) | CIVIL RIGHTS under 42 U.S.C. |
| | ) | §§ 1983, 1985, 1986 & 1988 |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM IN REPLY TO THE MOTION TO DISMISS OR ALTERNATIVELY FOR SUMMARY JUDGMENT FILED BY DEFENDANTS CONNICK, KENNEDY, BERRY AND JORDAN

COMES NOW, the Plaintiff, and files the following *Memorandum* in response to the Defendants[1] motion and memorandum to dismiss, or for summary judgment:

## I.    THE DEFENDANTS CANNOT BEGIN TO MAKE AN ISSUE OF PRESCRIPTION

The Defendants' discussion of prescription is found in one brief paragraph. See *Defendants' Memorandum, at 9-10.* The question of when a *§ 1983* cause of action accrues is a question of federal law, Piotrowski v. City of Houston, 51 F.3d 512, 516 n.10 (5th Cir. 1995), but statute of limitations questions must be answered in reference to the statute of limitations of the forum state. "Congress has not provided a statute of limitations in *§ 1983* cases; therefore, federal courts borrow the forum state's general personal injury limitations period." Piotrowski, 51 F.3d at 514 n.5 (citing Owens v. Okure, 488 U.S. 235, 249-50, 109 S. Ct. 573, 581-582, 102 L. Ed. 2d 594 (1989)).

---

[1] In this pleading, the "Defendants" refer only to Defendants Connick, Kennedy, Berry and Jordan, present or former prosecutors with the Office of the District Attorney.

In this case, under Article 3492 of the Louisiana Civil Code, the statute of limitations for "delictual actions" is one year, commencing from the day the injury or damage is sustained, i.e., the date at which the cause of action accrues.

While Defendants do not cite any authority in their *Memorandum*, they do tell us that "plaintiff had actual knowledge of all of the actions of the DA Defendants of which he complains more than one year prior to the filing of the complaint herein on January 7, 2000." *Defendants' Memorandum, at 10.* Further, all of the affidavits make much of the precise dates of specific events that led to Plaintiff's unconstitutional conviction. The Defendants would apparently have this Court parse the Complaint, paragraph by paragraph: If one aspect of the constitutional violation happened on one date, it would allegedly prescribe one year later; if another happened two weeks later, it would prescribe at a different time.

This is simply not the law. In Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994), the Supreme Court dealt squarely with the issue. The Court reasoned that a *§ 1983* cause of action challenges the nature of confinement in a manner analogous to a writ of habeas corpus, with all the comity concerns that mandate the exhaustion of state remedies, and respect for the finality of convictions.[2] The Court held that § 1983 claims involving suppression of exculpatory evidence and suborning perjury were, like their common law counterparts, subject to the requirement of "termination of the prior criminal proceeding in favor of the accused." Heck, 512 U.S. at 484, 114 S. Ct. at 2371. In accordance with its belief that "civil tort actions are not appropriate vehicles for

---

[2] With respect to the statute of limitations, the Court also analogized to the common law tort of malicious prosecution "because, unlike the related cause of action for false arrest or imprisonment, it permits damages for confinement imposed pursuant to legal process." Id. at 484. One element of malicious prosecution is dismissal, in one way or another, of the charges against the accused.

challenging the validity of outstanding criminal judgments," id. at 485, the Court held that,

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 *plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus.*

Id. at 486-87, 114 S. Ct. at 2372, 129 L. Ed. 2d at 394 (emphasis supplied); see also Mancini v. Lester, 630 F.2d 990, 996 (3d Cir. 1980) (on the issue of prescription, "it is also significant that te complaint appears to allege a continuing violation").

Indeed, this rule makes abundant good sense. If it were not the case, state criminal trials would constantly be interrupted as lawyers ran off to federal court to file the latest amendment to their §1983 law suit.

The rule of Heck squarely controls this case, and puts paid to any argument that any issues are prescribed. None of the issues became ripe until the termination of the proceedings against Plaintiff--on January 8, 1999.

## II.    THE MOTION SHOULD NOT BE HEARD OR FULLY BRIEFED UNTIL THE PARTIES HAVE HAD THE OPPORTUNITY TO COMPLETE SIGNIFICANT AND RELEVANT DISCOVERY

In their memorandum, the Defendants argue:

> Rule 56(c) provides for the granting of summary judgment if "pleadings, *depositions, answers to interrogatories*, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*Defendants' Memorandum, at 8* (emphasis supplied).

In this case, there have been no "depositions [and] answers to interrogatories". This is not for want of trying. Without in any way meaning to question the intentions of the defendants, it has

3

not been possible to complete *any* of the depositions of the major witnesses. As set forth in greater detail in Plaintiff's motion, he started trying to take the depositions of the critical witnesses prior to Christmas. For various reasons, the defendants avoided a date being set for their depositions until precisely one day after they knew (because they would file the motion on January 16) that the opposition to the *Motion to Dismiss* would be due.

Regardless whether this was intentional, it has deprived Plaintiff of his ability meaningfully to contest various factual issues. The vast majority of facts that must be considered in assessing a claim of prosecutorial immunity, for example, revolve around facts that are in the unique possession of the prosecution. To the extent that they claim that they were only preparing for trial, for example, how many investigative forays did they conduct that involved witnesses who had never previously been discovered? What options did they have for investigation? Could they have called upon the NOPD or investigators for the Office of the District Attorney? Did they learn (and fail to disclose) exculpatory evidence during the pendency of Plaintiff's appeal, when they were no longer acting as lawyers for the State? Did Roger Jordan have additional contact with witnesses against Plaintiff after he was removed from the case? All of these cannot be resolved without the opportunity to depose the key witnesses.

On the other hand, if the Defendants claim that kidnaping witnesses and forcing witnesses to talk are *bona fide* acts of a prosecutor (and they really don't), where is the support for that position? To the extent that the only defense to these aspects of Plaintiff's claim relies on an argument of prescription, the Defendants misperceive the nature of the claim. As discussed in above, the statute of limitations does not apply piecemeal to each aspect of the violation of Plaintiff's rights, but upon dismissal of the criminal charges.

**III.    THERE ARE HIGHLY SIGNIFICANT ISSUES OF FACT THAT MUST BE**

4

**RESOLVED, AND THERE IS CLEARLY NO BASIS FOR SUMMARY JUDGMENT**

It goes without saying that the burden of proving the propriety of summary judgment rests with the moving party. Lemelle v. Universal Mfg. Corp., 18 F.3d 1268, 1272 (5ᵗʰ Cir. 1993) ("court reviews evidence and all reasonable inferences therefrom in light most favorable to the nonmoving party"). Additionally, the burden on the moving party is a very heavy one. Defendants cite Lowery v. Texas A & M, 117 F.3d 242 (5ᵗʰ Cir. 1997), in their *Memorandum, at 8,* but without discussing the stringent rule that the case sets out:

> A motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.' Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, 677 F.2d 1045, 1050 (5ᵗʰ Cir. 1982). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. Campbell v. Wells Fargo Bank, 781 F.2d 440, 442 (5ᵗʰ Cir. 1986). The district court may not dismiss a complaint under rule 12(b)(6) 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief.' Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Blackburn[ v. Marshall], 42 F.3d [925,] 931 [(5ᵗʰ Cir. 1995)]. The strict standard of review under rule 12(b)(6) has been summarized as follows: 'The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief.' 5 Chalres A. Wright & Arthur R. Miller, Federal Practice and Procedure 167....

Lowery, 117 F.3d at 247.

The policy reasons for this rule are obvious: If there is valid grounds for the case, it should not be dismissed, but should be allowed to proceed to its conclusion. The defendants, if later aggrieved, can always re-urge the issue, in this court or on appeal.

In this regard, it is worth noting (from a case cited by the Defendants) that,

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with

> affidavits, if any," which it believes demonstrates the absence of a
> genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).[3]  In this

context, a perusal of the Defendants' *Motion* and *Memorandum* fails to reveal any effort to identify

the specific areas that the Defendants believe to be without dispute.   Indeed, a review of the

Defendants' *Answer* reveals that the vast majority of the allegations are simply denied, albeit without

any effort to state what the alternative version might be.

Bearing in mind the Defendants' burden at least to identify the areas where consensus is

supposedly available, then, Plaintiff suggests that no such showing has been made (or even alleged).

> **a.    WHILE THE ISSUE OF INDIVIDUAL IMMUNITY CANNOT BE
> SETTLED UNTIL DISCOVERY IS MORE ADVANCED, IT IS
> CLEAR THAT ACTS HAVE BEEN TAKEN BY THE DEFENDANTS
> THAT FALL OUTSIDE THEIR PROTECTIVE SHIELD**

At federal law, the idea of a common law immunity for prosecutors was first enumerated by

the Supreme Court in the case of Yaselli v. Goff, 275 U.S. 503, 48 S. Ct. 155, 72 L. Ed. 395 (1927),

in which the Court, in a *per curiam* opinion, dismissed claims that a Special Assistant to the

Attorney General of the United States "maliciously and without probable cause procured plaintiff's

grand jury indictment by the willful introduction of false and misleading evidence." See Imbler v.

Pachtman, 424 U.S. 409, 422, 96 S. Ct. 984, 991 (1976).  The Court agreed that principles of public

policy granted a public prosecutor, in the performance of the duties imposed upon him by law,

absolute immunity "from a civil action for malicious prosecution based on an indictment and

prosecution, although it results in a verdict of not guilty rendered by a jury."  Yaselli v. Goff, 273

---

[3]  Celotex also notes that summary judgment is only available "after adequate time for
discovery...." Celotex, 477 U.S. at 322, 106 S.Ct. at 2552.  The time has been "inadequate" in the
send that the Defendants have failed to comply with his request for setting the deposition dates.

U.S. at 422.

Subsequently, in Imbler v. Pachtman, the Court held that absolute prosecutorial immunity extended to suits brought under § 1983. The court rejected arguments that legitimately wronged plaintiffs would be left without a remedy against overzealous or malicious prosecutors. Indeed, the Court encouraged the use of criminal sanctions and disciplinary procedures for improper actions in court.

> Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights on the strength of *18 U.S.C. § 242*, the criminal analog of *§ 1983*. The prosecutor would fare no better for his willful acts. Moreover, a prosecutor stands perhaps unique among officials whose acts could deprive persons of constitutional rights, in his amenability to professional discipline by an association of his peers.

Imbler, 424 U.S. at 429, 96 S. Ct. at 994 (citations and footnotes omitted).

However, there is a clear exception to the Imbler rule:

> We have no occasion to consider whether life or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator *or investigative officer* rather than that of an advocate. We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from civil suit for damages under *§ 1983*.

Imbler, 424 U.S. at 430-31, 96 S. Ct. at 995 (emphasis supplied).[4]  The Court went on to hold that

---

[4] With respect to the state law claims, Defendants cite Knapper v. Connick & Paddison, No. 96-0434 (La. 10/15/96), 681 So. 2d 944. However, the Court explained its holding:

> A determination that prosecutors are entitled to absolute immunity for conduct within the course and scope of their prosecutorial functions does not mean that a prosecutor will be immune from suit in all cases. Immunity is granted only in those instances where the function being served is advanced by the extension of immunity. For instance, in *Buckley v. Fitzsimmons*, 509 U.S. 259, 125 L. Ed. 2d 209, 113 S. Ct. 2606 (1993), the United States Supreme Court held that while the actions of a prosecutor that are intimately associated with the judicial

"at some point" in his decision making the prosecutor crosses the line. Id. 424 U.S. at 431, n.33, 96 S. Ct. at 995, n.33. Notably, in listing the different jobs that the prosecutor may legitimately perform within his prosecutorial function, the court never goes so far as to mention going out and affirmatively investigating, or kidnaping witnesses.

Six years later, in Briscoe v. LaHue, 460 U.S. 325, 103 S.Ct. 1108, 75 L. Ed. 2d 96 (1982), the Supreme Court suggested that the "prosecutor's immunity ceases when he acts in a capacity other than his quasi-judicial role." Id. at 342 n.28, 103 S.Ct. at 119 n.28, citing Hampton v. City of Chicago, 484 F.2d 602, 608 (7ᵗʰ Cir. 1973), cert. denied, 415 U.S. 917, 94 S. Ct. 1413, 39 L. Ed. 2d 471 (1974).

Indeed, in both Burns v. Reed, 500 U.S. 478, 111 S. Ct. 1934, 114 L. Ed. 2d 547 (1991), and Buckley v. Fitzsimmons, 509 U.S. 259, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993), the Court stressed a functional approach, one which looks to "the nature of the function performed, not the identity of the who performed it." Forrester v. White, 484 U.S. 219, 229, 108 S. Ct. 538, 545 (1988).[5]

It is not sufficient, for example, to say that the work was performed by a prosecutor, and the

---

> phase of the criminal process and which occur in the course of a prosecutor's role as an advocate for the state are entitled to absolute immunity, where prosecutors act in an **investigatory**, administrative, ministerial or other **role that has no functional tie to the judicial process, only a qualified immunity is afforded**.

Id. at 950 (emphasis supplied).

[5] "This point is perhaps best illustrated by the determination that the senior law enforcement official in the Nation – the Attorney General of the United States – is protected only be qualified rather than absolute immunity when engaged in the performance of national defense functions rather than prosecutorial functions." Kalina, 522 U.S. at 127, 118 S.Ct. at 508 (citation omitted).

prosecutor is therefore immune: "Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive." Buckley, 509 U.S. at 275 n.6, 113 S.Ct. at 2618 n.6, quoting Burns v. Reed, 500 U.S. at 495. .

For example, in Buckley v. Fitzsimmons, 509 U.S. 259, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993),

> When a prosecutor performs the investigative functions normally performed by a detective or police office, it is "neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other."

Id. at 273, 113 S.Ct. at 2616, quoting Hampton v. Chicago, 484 F.2d 602, 608 (7th Cir. 1973), cert. denied, 415 U.S. 917 (1974).

Neither is this merely true prior to a finding of probable cause.

> Of course, a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination . . . a prosecutor may engage in "police investigative work" that is entitled to only qualified immunity.

Buckley, 509 U.S. at 274, 113 S.Ct. at 2616.

**b.    IN THEIR MOTION TO DISMISS, DEFENDANTS DO NOT DISCUSS THE VAST MAJORITY OF THE CLAIMS, FOCUSING ALMOST EXCLUSIVELY ON THE SUPPRESSION OF FAVORABLE EVIDENCE**

There are several aspects of Plaintiff's claim (set forth in great detail in his Complaint) that go with barely a mention in the *Motion to Dismiss*. Because these are not mentioned, the Defendants cannot be said to have met their burden of proof.

9

### i.   THE KIDNAPING OF WITNESSES CANNOT BE A PROPER PROSECUTORIAL FUNCTION

One such issue is the "kidnaping" of witnesses who were forced to go to the Office of the District Attorney for the remainder of trial even when needed by Mr. Cousin. The only reference to this comes in Roger Jordan's affidavit where he states:

> Plaintiff Cousin raised allegations regarding "alibi witnesses" who were asked to remain in the District Attorney's Office during the trial . . . in the Motion for a New Trial. . . .

*Motion to Dismiss, Exhibit 4, at ¶ 9.* This seems directed solely to the question of prescription, which is dealt with below. Defendant Jordan does not even bother to pretend that the allegations are not correct, perhaps because he knows that they are.

If the defendants do not address the merits of the claim, then Plaintiff has no burden to do so. However, he does in any event. Attached to this pleading is the entire record of the Motion for a New Trial that was held in Mr. Cousin's capital case. See *Exhibit F.*

At the motion for a new trial, Jordan admitted that they took at least three people over to the D.A.'s Office, including Romanza Hayes, Michael Doss and Don Mathieu, as well possibly as James Smith. (Exhibit F, at 57) He knew that all four were listed as defense alibi witnesses. (Exhibit F, at 42, 60) He therefore knew that they might all four be called as defense witnesses. (Exhibit F, at 60)[6]

Michael Doss was a teammate of Shareef's who was under a defense subpoena. (Exhibit F, at 173) He would have testified that the game did not end until after ten p.m.[7] When he was waiting

---

[6]Unfortunately (and inexplicably) the trial court sustained the objection as to all the witnesses who were listed on the alibi list. (See, e.g., MNT at 35-41, 47-48, 55) This was a mistake, since the evidence was relevant to showing the extent to which the State knowingly and intentionally suppressed favorable evidence.

[7]As with many other witnesses, the trial court refused, inexplicably, to allow the defense to prove what was alleged in the motion for a new trial--that Mr. Doss would have confirmed the

in the hall to testify, he spoke with Willard Hill, one of the defense lawyers. (Exhibit F, at 157)

Later, he was told by a member of the D.A.'s Office to go over there and stay. (Exhibit F, at 156)

The prosecution knew of his exculpatory evidence and secreted him from the defense at the time of

trial.[8]  One of the defense lawyers, Roland Belsome (now a sitting judge), recalled asking Byron

Berry where Michael Doss was, and receiving no reply.

James Smith was on the opposing *Hunters Field* team, and was subpoenaed as an alibi

witness by the defense. (Exhibit F, at 172)  He, too, spoke with the prosecution prior to trial, and

told them that the game started late.  After playing, the team had a short pep talk from their coach,

Tyrone Wilson, as they were removing their uniforms.  He got home when the ten o'clock news was

going off.  His mother, Sheila, was watching it, waiting up for him to get there.[9]  Before the trial, he

got called into the DA's office by Roger Jordan.[10]  His mother took him in.  First, Jordan asked

_____

other witnesses' testimony that the game did not end until after ten p.m. (Exhibit F, at 154)
Interestingly, secure in the knowledge that Mr. Doss was in the D.A.'s Office and therefore
unavailable to the defense, Jordan tried to ask one defense witness what he would say if he knew
that Mr. Doss thought the game ended earlier. (Tr. XIX at 129) Since this evidence never came
out either at trial or on the post-trial motion, it must be assumed that this question was yet
another example of the prosecution's bad faith.

[8]Adding insult to injury, the prosecution asked another witness: "Are you a[wa]re that
Mike Doss says that Shareef was dropped off first?" (Tr. XIX at 129) To be sure, the objection
was sustained.  However, to start to use this kind of statement in violation of the Confrontation
Clause when the witness would be testifying but for the prosecution's misconduct is un-
conscionable.

[9]Again, the defense was not allowed to prove this at the motion for a new trial. (Exhibit F,
at 163)

[10]Mr. Smith testified that he received a subpoena to come to Jordan's office prior to the
trial. (Exhibit F, at 164)  In two pending capital cases, it has recently come to light that ADA
Jordan routinely uses illegal "Article 66" subpoenas to make potential witnesses come to his
office to be interviewed, without the court-authorization mandated by the Code.  See *La. Code
Crim. Pro. Art. 66*.  This is the way he made people come to his office here, and further adds to
the illegitimate flavor of the case.

11

questions and they took notes. Then Jordan repeated the questions and taped the interview. Smith, too, was secreted during trial for a couple of days. (Exhibit F, at 168-69)[11]

Don Mathieu Jr. was a player for the team playing against Shareef, *Hunters Field*. Apparently, he was subpoenaed by neither side (Exhibit F, at 174), but appeared at the court on his own account. He recalled that the game got rescheduled and it was not over until late, definitely after ten p.m. At the time of the trial, he believed it was a police officer of some kind who told him to wait in the D.A.'s office. (Exhibit F, at 150) He had exculpatory evidence to provide, and he was secreted away from the defense at the time of trial.

When ADA Byron Berry took the stand at the motion for a new trial, the prosecution came up with the rather extraordinary story that the witnesses were told to cross the street because there was air conditioning in the DA's office. (Exhibit F, at 111) On cross, he had to admit that the case was tried in January. (Exhibit F, at 117)[12]

The Defendants have provided no specific authority for the notion that kidnaping witnesses is part of the prosecutorial function. Their *Motion to Dismiss* must, therefore, fail on this ground. However, common sense surely tells us that such action would fall within the exception noted in

---

[11]Sheila Smith was the mother of James Smith. She was not allowed to testify at all at the motion for a new trial (Exhibit F, at 205), but she would have testified that on March 2, 1995, James went to the New Orleans Recreational Department's Treme Center for a basketball game. She would have provided independent testimony that when James got home that night she was in bed with the TV on. The ten o'clock news was just going off. Since it takes him about ten minutes to get home from the Treme Center on his bike, he would have left at roughly 10:20 p.m. When her son was called by Jordan, she stayed with him the whole time. At the time of trial, at first she sat in the courtroom. Then the D.A. told her to go with James over to the D.A.'s office.

[12]When the motion was heard, it was a hot summer's day in New Orleans. Perhaps this is what gave the prosecution the preposterous idea of pretending that it was the heat that led them to kidnap the defense witnesses away. Clearly, a jury should be allowed to consider whether to believe this story.

Buckley:

> Of course, a determination of probable cause does not guarantee a
> prosecutor absolute immunity from liability for all actions taken
> afterwards. Even after that determination . . . a prosecutor may
> engage in "police investigative work" that is entitled to only qualified
> immunity.

Buckley v. Fitzsimmons, 509 U.S. 259, 274, 113 S. Ct. 2606, 2616, 125 L. Ed. 2d 209 (1993).

If a prosecutor may be held liable for "conduct in obtaining an arrest warrant," Kalina v.

Fletcher, 522 U.S. 118, 122, 118 S.Ct. 502, 505, 139 L.Ed.2d 471 (1997), then surely he may be held

liable for hauling people into custody without any kind of probable cause at all? Indeed, just as the

prosecutor in Kalina was not protected when he took the unusual step of swearing out the warrant

for probable cause (rather than allowing a police officer to do so), so surely the prosecutors in this

case cannot be protected when performing illegal investigation on a case.

Even though the NOPD has suffered on occasion from a dubious reputation, surely even they

would not perform "police investigation work" in this manner.

### ii. ILLEGALLY INTERROGATING WITNESSES CANNOT BE A PROPER PROSECUTORIAL FUNCTION

Another is the illegal coercion of witnesses, forcing them to come to the Office of the District

Attorney and/or to talk with Defendant Jordan and his colleagues.[13] Roger Jordan does not even

mention this in his affidavit, save to attach what he calls a "Notice to Appear" to it. See Motion to

Dismiss, Exhibit 4 at ¶20. Indeed, the defendants admit that they issued these fraudulent subpoenas

---

[13] The defendants do argue that Plaintiff does not have standing to raise this claim, but
that position cannot stand the lightest scrutiny. First, it cannot be argued that Plaintiff did not
suffer harm from these illegal actions taken in his case: After all, the efforts to confuse his alibi
witnesses at his trial stemmed directly from this conduct. Second, defendants misperceive the
notion of standing in Louisiana, where "[a]ny person adversely affected by a . . . seizure
conducted in violation of this Section shall have standing to raise its illegality in the appropriate
court." La. Const. Art. 1, §5.

to at least ten persons with knowledge of the case, *Answer, at ¶¶ 160-64*, in order to force them to speak with the defendants.

The so-called "Notice to Appear" is otherwise known as an Article 66, or DA's, Subpoena. However, in this case it is patently illegal, since such a subpoena requires prior judicial authorization. See *La. C.Cr.P. art. 66*. In this case, then, the Defendants used patently illegal methods to force people to talk to them about the case. This is not the function of the prosecutor; it is not, honestly, the function of the investigating officer, although it is much closer to his role than the prosecutor's.

While the Defendants argue once more that Plaintiff somehow does not have standing to raise this aspect of the claim, it is clear that these actions resulted in prejudice to Plaintiff and his rights. At the Motion for a New Trial, Jordan admitted that he had talked to "many witnesses" about Shareef's alibi. (Exhibit F, at 32) Some of this was not known to the defense. For example, Jordan talked to both Renee and Ray Douglas (Exhibit F, at 50), both of whom had refereed the game, and neither of whom was listed as a potential alibi witness by the defense. That the prosecution did not subpoena the Douglas brothers was, Jordan admitted, due to the fact that they were not helpful to the State. (Exhibit F, at 51-52) Both said the game was over late; one told him that he got home in the ten o'clock range, and the other that it was closer to eleven. (Exhibit F, at 52-54) He agreed that "that wasn't helpful to the prosecution at all. . . ." (Exhibit F, at 54)

Indeed, when the brothers testified at the Motion for a New Trial, it became clear that their statements to the State had been even more exculpatory than Jordan admitted. Renee Douglas testified that he was called twice by the prosecutors (Exhibit F, at 196), and he told them that he had been a referee, the game ended late and he had his sister pick him up at 10:30 p.m. (Exhibit F, at 192-94) Raymond Douglas talked to them once (Exhibit F, at 201) and said that the game ended

14

about 10:15 p.m. (Exhibit F, at 202)

Even this was not all of the suppressed evidence. Mr. Cousin also sought to prove in the lower Court that the prosecution had other exculpatory statements taken from, *inter alia*, Raymond Goodwill,[14] Arnold Moore, Shawn Moore, Arian White and Eric White.[15] The prosecution also hid other evidence with respect to James Rowell.

### iii. ILLEGALLY SEEKING OUT PEOPLE WHO WILL HELP PLACE SHAREEF COUSIN ON DEATH ROW

The Defendants approach this issue as if it were solely one of talking to witnesses prior to trial. However, there is a vast distinction between what might be characterized as witness preparation (arguably, under the current case law, a proper trial function of a prosecutor) and venturing out on investigative forays where one rounds up possible witnesses and then convinces them to provide a particular story. "Immunity does not protect those acts a prosecutor performs in administration or investigation not undertaken in preparation for judicial proceedings." Hill v. City of New York, 45 F.3d 653, 661 (2d Cir. 1995), citing Barbera v. Smith, 836 F.2d 96, 100 (2d Cir. 1987) (distinguishing between the investigator's role in acquiring evidence and the advocate's in organizing and evaluating that evidence), cert. denied, 489 U.S. 1065 (1989). In this context,

> the 'functional' test for absolute immunity is an objective one; it does not depend upon the state actor's subjective intent. To the extent that the creation of the [evidence] fulfilled an investigatory purpose, [the

---

[14]Raymond Goodwill was taped by Jordan on October 12, 1995, at 4:20 pm. (Tr. 1/26 at 44) There was a conversation with Jordan before the tape recorder was turned on. (Tr. 1/26 at 50)

[15]Coach White was also taped by Jordan. Before the taping, he had talked for a while (Tr. 1/26 at 145) when Jordan was taking notes. These notes were not revealed to the defense. On the tape he said that the game ended around 9:20, 9:25 (Tr. 1/26 at 141-42) when he meant that this was the time games normally ended. (Tr. 1/26 at 146) The notes (still not in Plaintiff's possession) might well have proven this to have been the slip of the tongue that it clearly was.

prosecutor] cannot claim absolute immunity. The Supreme Court points out that investigative work may not be transformed into advocacy simply by being characterized as work in preparation for trial. . . .

Hill, 45 F.3d at 662-63.[16]

On such person would be James Rowell. His name does not appear anywhere in the NOPD investigative file. See *Exhibit A*. Therefore, apparently he was developed as a witness solely by the prosecutors in this case. In his testimony at trial, James Rowell stated that Jordan had told him what to say, and that he had effectively been told to commit perjury. See *Exhibit D*.

Another such person would be Wayne Cooks whose name, again, does not appear in the NOPD file. Cooks gives elaborate detail concerning the efforts to which Jordan went to get him to tell a concededly false story against Plaintiff in this case.

Whether there are more such witnesses will only be known when the defense is provided with all of the records that the Office of the District Attorney has, and when various defendants have been deposed. Until that happens, the Defendants cannot prove that this kind of shocking action falls within the accepted realm of the prosecutorial function.

    c.    **DEFENDANTS DO NOT DISCUSS THE VAST MAJORITY OF THE "SUPPRESSED EVIDENCE" CLAIMS, AND MAKE NO SHOWING THAT DISMISSAL SHOULD BE GRANTED**

In the affidavit in support of the *Motion to Dismiss* Roger Jordan only mentions in passing that "all of the information alleged to be 'exculpatory' under Brady [was provided to the defense] no later than June 4, 1998." *Motion to Dismiss, Exhibit 4, at ¶12.* This is simply not the case. Indeed, Val Solino states that he turned over "notes and tapes [of alibi witnesses] to defense counsel

---

[16] The Hill decision is relied upon by the Defendants. *Memorandum at 11.*

on January 7, 1999." *Motion to Dismiss, Exhibit 7, at ¶13.*[17]  What Mr. Solino does not say in his

affidavit--but will no doubt concede when deposed--is that he turned over other highly significant

material to the defense when defense counsel reviewed (portions of) the State's file on September

10, 1998.[18]  Neither does he state in his affidavit that he told undersigned counsel (when confronted

by the fact that materials were obviously not being made available) that there was a box containing

other materials that the State considered to be outside the parameters of Judge Waldron's "open file"

discovery order.  Neither do any of the affiants explain how the "complete" file that has allegedly

been turned over to Plaintiff's counsel contains no handwritten notes from any prosecutor,[19] even

though we know full well that extensive discussions took place between Mr. Jordan and both James

Rowell[20] and Wayne Cooks.[21]

Indeed, there is some doubt that some of Defendants' affidavits should be credited at all.

Roger Jordan has taken the highly dubious position, to date, that he did not withhold *Brady* material

at all.  See *Defendant's Memorandum, Appendix 4* (Affidavit of Roger Jordan).[22]  This is simply

---

[17]  The fact that the State may believe the defense to be in possession of exculpatory evidence does not relieve the State of its burden to produce it. Indeed, prior to Mr. Cousin's trial, the defense had not interviewed all of the witnesses to whom State agents spoke.

[18]  This included extensive material on the falsification of Connie Babin's eye prescriptions, along with other materials that showed extensive investigative contacts between Roger Jordan and her.

[19]  It is not clear precisely what "notes" Mr. Solino is referring to in his affidavit, since Plaintiff's file reflects receipt of the tapes of the various witnesses on that day.  Certainly, Mr. Solino is not referring to any notes other than those made of alleged alibi witnesses.

[20]  See *Exhibit D.*

[21]  See *Exhibit E.*

[22]  Indeed, in the Defendants' *Answer*, "[t]he defendants deny that any Brady material was withheld from the defense in the prosecution of plaintiff. . . ." *Answer, at ¶ 180.*

ludicrous. Indeed, there is some question as to whether this position is taken in good faith, given the

Supreme Court of Louisiana's clear statement that "[t]he prosecutor did not disclose this **obviously**

**exculpatory statement** to the defense prior to the trial, as required by Brady v. Maryland, 373 U.S.

83 (1963), and Kyles v. Whitley, 514 U.S. 419 (1995)." State v. Shareef Cousin, No. 96-KA-2973

(La. 4/14/98), 710 So.2d 1065 (emphasis supplied).

Indeed, and it is clear that the Defendants *still* have not turned over the complete files on this

case. This means that Defendants have not, and cannot, prove that there is no issue to be resolved

with respect to the suppression of favorable evidence. For example, in Carter v. Burch, 34 F.3d 257

(4th Cir. 1994), the court noted that "prosecutors who withheld materially exculpatory evidence

subsequent to the trial and conviction were only entitled to qualified immunity, because they were

no longer personally involved in the post-conviction proceedings." Id. at 263, citing Houston v.

Partee, 978 F.2d 362, 367 (7th Cir. 1992), cert. denied, 113 S.Ct. 1647 (1993).[23] Again, then, at least

at this stage of the proceedings, the defendants cannot support dismissal.

### IV. ON THE ISSUE OF HARRY CONNICK'S LIABILITY, PLAINTIFF VIGOROUSLY DISPUTES THE "FACTS" SET FORTH IN THE DEFENDANTS' PLEADING AND AFFIDAVITS

The issue of Defendant Connick's liability is focused largely on his claim that he has

vigorously tried to prevent *Brady* violations and other prosecutorial misconduct, and that "there has

only been one instance where I have learned that evidence that 'Brady' materials were purposely

withheld from a defendant which possibly involved four prosecutors who had worked for me, one

---

[23] With respect to the March 5, 1995, Babin statement, it is clear that Jordan had the statement prior to trial, and chose not to provide it to Plaintiff. However, with respect to the plethora of other evidence that was suppressed, we cannot tell until Jordan is deposed when he had it. Neither can we tell until discovery is further progressed the scope of the exculpatory evidence that Mr. Jordan and others are still hiding.

18

of whom was death at the time the violation was reported. * * * I did report the violation to the

Louisiana State Bar Disciplinary Board." *Memorandum, Exhibit 5, ¶15.*[24]

Connick's affidavit again illustrates more the need for discovery than the propriety of

summary judgment. Discovery violations are, sad to say, common in Orleans Parish, and Connick's

assurance that he once reported three people who were not in his office any more to the Bar is hardly

cause for confidence that he is enforcing *Brady*, or any other rule of good conduct, in his office.

First, there is Mr. Cousin's case where the Louisiana Supreme Court ruled that a discovery violation

took place, yet Connick refuses to admit it or chastise his staff. State v. Shareef Cousin, No. 96-KA-

2973 (La. 4/14/98), 710 So.2d 1065 (capital murder case;  the Court notes that "[t]he prosecutor did

not disclose this **obviously exculpatory statement** to the defense prior to the trial, as required by

Brady v. Maryland, 373 U.S. 83 (1963), and Kyles v. Whitley, 514 U.S. 419 (1995)").[25]

Then there is a finding by the Supreme Court of the United States that a *Brady* violation

occurred. Kyles v. Whitley, 514 U.S. 419, 441, 115 S.Ct. 1555, 1569, 131 L.Ed.2d 490 (1995) ("on

the brief was Harry F. Connick"; capital murder case;  "In this case, disclosure of he suppressed

evidence to competent counsel would have made a different result reasonably probable.").  Rather

than take action on this, Mr. Connick pretends that a "split decision" merely illustrates that the

evidence was possibly not *Brady* material.

---

[24] The case he is talking about is the capital prosecution of John Thompson, where evidence came to light that various members of his office suppressed favorable evidence. What he does not say, however, is that he reported Michael Riehlmann solely for failing to report (fast enough) the misconduct of Connick's employees. See *Exhibit H*. The stunning hypocrisy of this, coming from someone who would not even admit that a *Brady* violation took place in *Cousin* or *Kyles*, is further evidence of his perpetuation of the policy of turning a blind eye to misconduct in his own office.

[25] Note that he had almost two years between the Court's decision and being sued to do something, yet he did not.

Beyond this, there are many cases where Harry Connick knows, from published decisions that bear his name, that his assistants committed misconduct, yet he *never*--according to his own admission--did anything about it.[26] Furthermore, it is not just the reversals that should have caused him concern.[27]

---

[26] See, e.g., State v. Rosiere, 488 So.2d 965. 969-71 (La. 1986) ("Harry F. Connick" on the brief; second degree murder case reversed; "there is a 'reasonable probability' that, had the statements of Helfand, Oakleaf and Glasser been disclosed to defendant, the result of the proceeding would have been different"); State v. Perkins, 423 So.2d 1103, 1107-08 (La. 1982) ("Harry Connick" on the brief; capital murder case reversed for failure to turn over statement of witness that "supports the defendant's version of events"); State v. Carney, 334 So.2d 415, 418-19 (La. 1976) ("Harry F. Connick" on the brief; second degree murder conviction; suppression of "an arrangement between the district attorney's office and the State's witness Lois Lewis for the State to dismiss battery charges pending against her in exchange for her testimony at trial"); State v. Falkins, 356 So.2d 415 (La. 1978) ("Harry F. Connick" on the brief; armed robbery conviction; prosecution failed to "reveal that two of the state's eyewitnesses had earlier misidentified one of the robbers"); State v. Knapper, 579 So.2d 956 (La. 1991) ("Harry F. Connick, D.A." on brief; capital murder case; court finds prosecutor lied about turning his file over to the defense; prior inconsistent identification statement as well as suppression of evidence that murder weapon belonged to other suspects comprised "evidence, both exculpatory and impeachment, favorable to defendant"); State v. Smith & Wilkerson, 591 So.2d 1219, 1225 (La. App. 4th Cir. 1991) ("Harry F. Connick" on brief; second degree murder; despite state's denial, court finds that an agreement existed between the state and the main witness for his testimony); State v. Oliver, 682 So.2d 301, 309 (La.App. 4th Cir. 1996) ("Harry F. Connick" listed as counsel; "The variance among these [suppressed] statements cannot be overemphasized."; "the prosecutor had to know were statements of significant, material divergence frm their trial testimony and the prosecutor's vouching for Gray's credibility denied Oliver his constitutional right to a fair trial.").

[27] There are other cases where a discovery violation clearly took place, but it my not have been sufficiently prejudicial to require a new trial. see also State v. Marshall, 660 So.2d 819 (La. App. 4th Cir. 1995) ("Hon. Harry F. Connick" listed as counsel; attempted first degree murder; "The fact that Dorsey named another person, not Marshall, as the shooter is *obviously exculpatory evidence.*"; no reversal since no reasonable probability that the outcome would be different). There are other cases (where the facts are often not reflected in the opinion) where a discovery violation took place, but the case was reversed for other reasons. State v. Parker, 361 So. 2d 226 (La. 1978) ("Harry F. Connick" on the briefs; second degree murder; the State had "withheld information that the victim had previously been arrested two times, once on a charge of aggravated battery ... would have supported the self-defense plea of defendant"; reversed for lack of adequate record); State v. Smith & Scire, 600 So.2d 1319 (La. 1992) (massive *Brady* violation raised on appeal in capital case; reversed for other reasons; on remand, Roger Jordan

20

While Connick says that he made his solitary policy on *Brady* "available to all assistant district attorneys," *Memorandum Exhibit 5 at ¶6*, no policy was ever instituted to ensure that they reviewed these policies. There is no evidence of any policies that prohibit the other bizarre actions taken by the prosecutors in this case. Indeed, Connick's own affiants demonstrate that he never asked his assistants to look into the scope of his *Brady* problems until 1997--after the sins committed in Plaintiff's case, and after <u>Kyles v. Whitley</u>. Given that he has taken no action since commissioning the study of his own office's misconduct, certainly Connick's affiants do not establish that there is no issue of his liability.

Should there be any doubt, however, this is another issue that should not be resolved until Plaintiff has had the chance to depose Connick and develop the record.

## CONCLUSION

Wherefore, Plaintiff respectfully moves that the issue of summary judgment and the Defendants' motion to dismiss either be denied, or be withheld until such time as there has been adequate factual development.

---

found by Judge Winsberg to have failed to turn over exculpatory material; defendant Smith acquitted with the evidence); <u>see also</u> State v. Felton, 522 So. 2d 626, 627 (La. App. 4th Cir. 1988) ("Honorable Harry F. Connick" on brief; remand for hearing; police report "contains information that the victim's brother ... saw the victim alive and with an unknown male at a time when, according to a witness at trial ... relator had come to her house, admitted he had killed a woman, and washed blood from his arms"); <u>State v. Evans</u>, 463 So. 2d 673 (La. 1985) (remanded for review of the back sheet of the coroner's report); <u>State v. Peters</u>, 406 So. 2d 189 (La. 1981) ("Harry F. Connick" on brief; capital murder case; remand for review of grand jury transcript; "At oral argument before this court, defense counsel stated that Margenette Peters told him that she had lied in her testimony before the grand jury because of pressure from the district attorney").

21

Respectfully Submitted,

CLIVE A. STAFFORD SMITH
La. Bar No. 14444
636 Baronne Street
New Orleans, La. 70113
(504) 558-9867

Attorneys for the Plaintiff

**Certificate of Service**

       I hereby certify that I have served a copy of the foregoing pleading upon the following by hand:

Albert Thibodeaux
Office of the City Attorney
1300 Perdido Street, 5th Floor East
New Orleans, La. 70112

William F. Wessel
127 Camp Street
New Orleans, La. 70130-2507

       Done this 29th day of January, 2001.

23

# SEE RECORD FOR
# EXHIBITS
# OR
# ATTACHMENTS
# NOT SCANNED