UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 FEB 14 PH 4: 56

LORETTA G. WHYTE
CLERK

SHAREEF COUSIN,                    )
                                   )
            Plaintiff,             )
                                   )
v.                                 )          Civil No. 00-0069
                                   )          Section R Mag. 2
ANTHONY SMALL, *et al.*            )          CIVIL RIGHTS under 42 U.S.C.
                                   )          §§ 1983, 1985, 1986 & 1988
            Defendants.            )
                                   )
_____)


# PLAINTIFF'S SUPPLEMENTAL REPLY TO THE MOTION TO DISMISS OR ALTERNATIVELY FOR SUMMARY JUDGMENT FILED BY DEFENDANTS CONNICK, KENNEDY, BERRY AND JORDAN


CLIVE A. STAFFORD SMITH
La. Bar No. 14444
636 Baronne Street
New Orleans, La. 70113
(504) 558-9867

Attorney for the Plaintiff

Fee _____
Process _____
X Dktd _____
CtRmDep _____
Doc.No._____ 47

# TABLE OF CONTENTS

I.    THE DEFENDANTS CANNOT BEGIN TO MAKE AN ISSUE OF PRESCRIPTION
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.    THERE ARE HIGHLY SIGNIFICANT ISSUES OF FACT THAT MUST BE RESOLVED,
AND THERE IS CLEARLY NO BASIS FOR SUMMARY JUDGMENT . . . . . . . . . . . 2

      a.    THERE IS NO ABSOLUTE IMMUNITY FOR ACTS THAT ARE NOT THE
NORMAL ROLE OF THE PROSECUTOR . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            i.    FORCING WITNESSES TO TALK AGAINST THEIR WILL DOES NOT
FALL WITHIN THE AMBIT OF THE PROSECUTOR'S LEGITIMATE
FUNCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

            ii.    KIDNAPING WITNESSES DOES NOT FALL WITHIN THE AMBIT OF
THE PROSECUTOR'S LEGITIMATE FUNCTION . . . . . . . . . . . . . . . . 6

            iii.    ILLEGALLY SEEKING OUT PEOPLE WHO WILL HELP PLACE
SHAREEF COUSIN ON DEATH ROW . . . . . . . . . . . . . . . . . . . . . . . . 7

            iv.    PURSUING THE DEATH PENALTY AGAINST SHAREEF COUSIN
BASED, IN PART, UPON THE COLOR OF HIS SKIN DOES NOT FALL
WITHIN THE AMBIT OF THE PROSECUTOR'S FUNCTION . . . . . 14

            v.    CONSPIRING TO PREVENT THE DISSEMINATION OF MATERIAL
THAT SHOULD BE PROVIDED TO THE ACCUSED IN A CAPITAL
CASE DOES NOT FALL WITHIN THE AMBIT OF THE
PROSECUTOR'S FUNCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

IV.    ON THE ISSUE OF HARRY CONNICK'S LIABILITY, PLAINTIFF VIGOROUSLY
DISPUTES THE "FACTS" SET FORTH IN THE DEFENDANTS' PLEADING AND
AFFIDAVITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**PLAINTIFF'S MEMORANDUM IN REPLY TO THE
MOTION TO DISMISS OR ALTERNATIVELY FOR
SUMMARY JUDGMENT FILED BY DEFENDANTS
CONNICK, KENNEDY, BERRY AND JORDAN**

COMES NOW, the Plaintiff, and files the following *Memorandum* in response to the

Defendants[1] motion and memorandum to dismiss, or for summary judgment:

Plaintiff does not intend to rehash the arguments and law that he previously submitted to this

Court. However, he does elaborate on those arguments based on the evidence that has developed

in the course of discovery. Using the same headings, therefore, he respectfully submits:

I.     **THE DEFENDANTS CANNOT BEGIN TO MAKE AN ISSUE OF
PRESCRIPTION**

While the law needs no elaboration--the Defendants are simply in error in their "divide and

conquer" theory of prescription--it is now clear from discovery that the Defendants' timeline is

inaccurate. While Jordan states in his affidavit that all exculpatory material was turned over by June

4, 1998, this is simply not the case. He ultimately had to concede in his deposition that he did not

know what happened after he withdrew from the case in August 1998. *Exhibit I, at 76.*[2]

III.   **THERE ARE HIGHLY SIGNIFICANT ISSUES OF FACT THAT MUST BE
RESOLVED, AND THERE IS CLEARLY NO BASIS FOR SUMMARY
JUDGMENT**

The discovery process has highlighted various factual issues that must be submitted to the

jury, where the Defendants cannot bear their burden of proving that there is no genuine factual issue

---

[1] In this pleading, the "Defendants" refer only to Defendants Connick, Kennedy, Berry and Jordan, present or former prosecutors with the Office of the District Attorney.

[2] Furthermore, it is apparent that--contrary to the Defendants' earlier assertions--there are various documents in the file of the District Attorney that have not been turned over to this day. See, e.g., *Exhibit I, at 77-80, 84.* For example, Wayne Cooks apparently executed a statement on his outlandish, and utterly false, story about Plaintiff's involvement in this crime. *Exhibit I, at 158.*

1

in controversy.

### a.    THERE IS NO ABSOLUTE IMMUNITY FOR ACTS THAT ARE NOT THE NORMAL ROLE OF THE PROSECUTOR

As Plaintiff previously submitted, there are various acts committed against him where no reasonable person could argue that the Defendants were acting in the traditional roles of prosecuting attorneys. To be sure, the law in this area is confusing, chaotic, and in dire need of Supreme Court clarification.[3]  However, it is the Defendants' burden to prove that there are no facts that Plaintiff may prove that would entitle him to relief.

It should be borne in mind that absolute immunity is a very extreme measure.  It is not as if the mere rejection of the defense means that a prosecutor's head is placed on the guillotine.  After all, he may still assert a more limited, qualified immunity for all actions taken in good faith (and one might well wonder why acts taken in bad faith are immune at all).  In Simons v. Bellinger, 664 F.2d 774, 777 (D.C. App. 1979), citing Imbler, 424 U.S. at 430, the court

> recognized that public policy dictates that absolute immunity is not appropriate for prosecutors when they are 'engaged in essentially investigative as opposed to advocacy activities.' Thus, bona fide investigative officers, even those acting under the title of "prosecutor," are only entitled to qualified immunity for acts performed within the scope of their authority; under this type of immunity, officials are protected from liability if their acts are reasonable and performed in good faith."

---

[3] See Comment, *The Prosecutor, the Investigator, the Administrator*, 62 Miss. L.J. 169, 187-88 (1992) ("While the mess made by the Court of Appeals for the Fifth Circuit regarding prosecutorial immunity may not be as tidy as that created by the Fourth Circuit, it was just as effective"); compare Comment, *Buckley v. Fitzsimmons: Tradition pays a price for the reduction of Prosecutorial Misconduct*, 16 Whittier L.Rev. 301 (1995) (arguing that the Supreme Court had taken away too much of the prosecutor's absolute immunity); with Note, *The Endurance of Prosecutorial Immunity–How the Federal Courts vitiated Buckley v. Fitzsimmons*, 37 B.C. L.Rev. 1019, 1019 (1996) ("When the United States Supreme Court handed down its opinion in *Buckley v. Fitzsimmons* in June 1993, the decision was heralded as the beginning of the end of absolute prosecutorial immunity").

2

Id. at 777, quoting Briggs v. Goodwin, 186 U.S.App.D.C. 179, 190, 569 F.2d 10, 21 (D.C.Cir.1977),

cert. denied, 437 U.S. 904, 98 S. Ct. 3089, 57 L. Ed. 2d 1133 (1978).

There are certain aspects of the case where the Defendants cannot begin to make out a claim

of absolute judicial immunity.  In Bauers v. Heisel, 361 F.2d 581 (3d Cir. 1966) (en banc), cert.

denied, 386 U.S. 1021, 87 S. Ct. 1367, 18 L. Ed. 2d 457 (1967), the court noted that the real question

is "whether his duties are sufficiently judicial as to cloak him with the same immunity afforded

judges. . . ." Id. (citations omitted); Forsyth v. Kleindienst, 599 F.2d 1203 (3d Cir. 1979) ("We hold

that where the activities of the Attorney General depart from those which cast him in his quasi-

judicial role, the protection of absolute immunity will not be available." (citation omitted).

Sometimes to pose the question is to answer it:  Can it really be said that the coercion,

kidnaping and intimidation of witnesses is the kind of thing any judge or quasi-judge should be

doing?

        **i.**        **FORCING WITNESSES TO TALK AGAINST THEIR WILL DOES NOT FALL WITHIN THE AMBIT OF THE PROSECUTOR'S LEGITIMATE FUNCTION**

The Defendants have no made any effort to deny that Jordan coerced various witnesses to

talk to him by using DA Subpoenas, in an illegal effort to deprive Plaintiff of a fair trial.  Jordan did

not even mention this allegation save to attach a D.A. subpoena to his affidavit.  See *Motion to*

*Dismiss, Exhibit 4 at ¶20.*  While Jordan attempted to say that the DA Subpoena was not "coercive,"

he conceded that it sounded like a subpoena, and that someone who failed to respond to a subpoena

would he held in contempt. *Exhibit I, at 146.*  He admitted that he knew of witnesses who had felt

"compelled to come in" when they received a DA Subpoena. *Exhibit I, at 151.*  He admitted issuing

DA Subpoenas with a series of people who might have knowledge of Plaintiff's case. *Exhibit I, at*

3

*151-53.*[4]

D.A. Connick, a defendant in this case, agreed that it would be improper for one of his

assistants to coerce witnesses to talk to him:

> Q. * * * Would you agree that it would be improper, illegal,
> unethical, for any lawyer to coerce a witness into talking to them?
> * * *
> A. Well, meaning prior to trial, prior to his taking the stand? Yeah,
> I would say you're not supposed to coerce a witness into saying
> anything.

*Exhibit H, at 59.*

Connick agreed that the language in the D.A. subpoena was indistinguishable from the

language of a regular subpoena:

> Q. This language. I would like you to just read this language and tell
> – ask your opinion whether you think this is coercive or not. "You are
> hereby notified to appear before the District Attorney in the Criminal
> District Court for the Parish of Orleans on" such and such a day "to
> testify to the truth according to your knowledge in such matters as
> may be required of you." What does that sound like to you?
>
> A. It means that the district attorney wants to talk to you about a
> matter that falls within the realm of his responsibility.
>
> Q. And it is pretty similar to the language on the subpoena, isn't it?
>
> A. I would say so.

*Exhibit H, at 61-62.* While Connick said he thought this was not "coercive", this was pure advocacy:

His office had no policy that he could name regarding the use of these subpoenas, *Exhibit H, at 63,*

---

[4] Plaintiff has already discussed Louisiana law, providing him with standing for any
illegal seizure related to another person, when it affects him. *La. Const. Art. 1 §5.* However,
there is an independent way in which this clearly violated Plaintiff's rights as opposed to those
who were illegally seized: But for the improper actions by Jordan, Eric White would not have
been tripped up on time during trial, and Jordan would not have secured exculpatory evidence
(the statements of other witnesses confirming Plaintiff's alibi) that he then hid from the defense.

and he was not familiar with any authority that allowed for D.A. Subpoenas. *Exhibit H, at 64.*

Here, the prosecutors used patently illegal methods to force witnesses to talk to them. If the police did this, there would be no pretense that they were immune. The prosecutor-investigators cannot assert an immunity where the police-investigator would have none.[5] Indeed, if a prosecutor is liable for writing false statements in a probable cause warrant, Kalina v. Fletcher, 522 U.S. 118, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997), it is difficult to see how he could be immune for hauling citizens in without a warrant at all.

### ii.    KIDNAPING WITNESSES DOES NOT FALL WITHIN THE AMBIT OF THE PROSECUTOR'S LEGITIMATE FUNCTION

A second area where there can be little argument that Jordan and Berry were acting in a legitimate role as prosecutors concerns the kidnaping, or secretion, of witnesses. We have already discussed how Mr. Cousin's defense searched for the alibi witnesses who they thought were in the hall. See *Initial Memo, at 10-13.* Much as the Defendants may seek to challenge the Plaintiff's (truthful) version of events, that is not the issue here, for in a Rule 56 motion the facts must be

---

[5] Pflaumer v. United States Dept. of Justice, 450 F.Supp. 1125, 1135 (E.D. Pa. 1978) (When a prosecutor acts as an investigator, "[t]his function, performed outside the setting and structure of the courtroom's controlled atmosphere, is less affected by the additional protection aforded to individual's civil rights by allowing only qualified as opposed to absolute immunity. *   *   * [T]o extend [absolute immunity] to the investigatory aspects of the prosecutor's duties would permit the prosecutor an absolute immunity for precisely the same conduct for which police officers have traditionally been entitled to only a qualified immunity. There is simply no justifiable basis for recognizing such a distinction.") (citations and footnote omitted); Madison v. Purdy, 410 F.2d 99, 101-02 (5th Cir. 1969) ("If the State's attorney ordered and directed the officers to force the plaintiff to plead guilty, then certainly he is no less liable than are those who carried out his instructions. It would be wrong to hold the officers liable but the State's Attorney exempt. On motion to dismiss, it cannot be held that such acts were either within the scope of his jurisdiction as State's Attorney, or were authorized by law.") (citations omitted).

viewed in the light most favorable to the Plaintiff.[6]  These are as stated by Kern Reese in his

testimony at the motion for a new trial:[7]  The defense sought the alibi witnesses, and Berry lied to

counsel saying that he did not know where they were–*when Berry had secreted them in the Office

of the District Attorney.*

There can be no argument that this activity falls within the perimeter of the proper

prosecutorial activity.  Indeed, Connick said as much in his deposition:

> Q. * * * If the evidence showed that defense witnesses were told by
> members of your staff to go over to the D.A.'s office and stay there
> for the rest of the trial, and the defense lawyers were looking for those
> witnesses and it was represented to them by one of your staff that
> they weren't there and he didn't know where they were, would that be
> misconduct in your opinion?
>
> A.  It would depend on why they were told  -- the witnesses were
> told to do what they did.  But under the facts only as you have given
> them to me, I would say that that is not something that would be
> proper conduct on their part.

*Exhibit H, at 65-66.*

Not only would this not be "proper," but it would not fit the notion of the prosecutor's

function outlined in *Imbler*:

> Q.  * * * And that wouldn't be something that would fit within your
> idea of what is proper and appropriate prosec[u]torial function?
>
> A.  Right.

*Exhibit H, at 66.*

---

[6]  Ames v. Vavreck, 356 F. Supp. 931, 937 (D. Minn. 1973) ("Questions of fact cannot be disposed of on motion. Additionally, 'on motion to dismiss, it cannot be held that [the prosecutor's] acts were either within the scope of his jurisdiction . . . or were authorized by law.'") (citing cases).

[7]  This is attached to the original memo as *Exhibit F*, and was identified and attached to Kern Reese's deposition.

Again, if the police kidnaped a witness, there could be no argument that they were somehow immune.[8]

### iii.    ILLEGALLY SEEKING OUT PEOPLE WHO WILL HELP PLACE SHAREEF COUSIN ON DEATH ROW

A third area where the Defendants cannot prevail on their motion for summary judgment involves the investigation that they performed in the case.[9]  Here, we must be careful to distinguish between preparing witnesses to testify, and out-and-out investigation.[10]  "Immunity does not protect those acts a prosecutor performs in administration or investigation not undertaken in preparation for judicial proceedings."  Hill v. City of New York, 45 F.3d 653, 661 (2d Cir. 1995), citing Barbera v.

---

[8]  Cf. Gobel v. Maricopa County, 867 F2d 1201, 1205-6 (9th Cir. 1989) ("Gobel and DeFranco have alleged that the prosecutors acted in a non-prosecutorial investigatory role. Given the limited factual record at this point in the proceedings, it does not appear beyond doubt that the plaintiffs will be unable to prove that the prosecutors were engaging in police-type investigative work. * * * Gobel and DeFranco may be able to prove that the initial investigation to determine who wrote the bad checks is a police function that is preliminary and separate from the subsequent quasi-judicial determination to prosecute. If they also demonstrate that the prosecutors' misconduct during this police-like investigative stage caused their false arrest, Gobel and DeFranco will have proved a claim that falls outside the scope of absolute prosecutorial immunity.").

[9]  There was investigative work done by ADA's along side the NOPD in this case, but that involved ADA's Kennedy and Glass.  Berry conceded that it was very rare for an ADA's name to be mentioned in a police narrative. *Exhibit J, at 58.*  However, the issue here is not whether prosecutors went out investigating with the NOPD. The question is whether the Defendants can hide the investigation they did by calling it something different.

[10]  Of particular significance is Hampton v. City of Chicago, 484 F.2d 602, 608-9 (7th Cir. 1973) ("Prosecutorial conduct which traditionally has been treated as immune is often described as 'quasi-judicial' as opposed to investigatory activities normally performed by laymen, such as police officers. * * * Defendants argue that evidence gathering is so closely related to the presentation of evidence at trial that it should also be clothed with immunity. We find this argument unpersuasive. Even though defensible if conducted in good faith with probable cause, the State's Attorney's alleged participation in the planning and execution of a raid of this character has no greater claim to complete immunity than activities of police officers allegedly acting under his direction. The district court erred in holding that the immunity doctrine requires dismissal, without trial, of plaintiffs' charges against defendants Hanrahan and Jalovec.").

Smith, 836 F.2d 96, 100 (2d Cir. 1987) (distinguishing between the investigator's role in acquiring

evidence and the advocate's in organizing and evaluating that evidence), cert. denied, 489 U.S. 1065

(1989).[11]  In this context,

> the 'functional' test for absolute immunity is an objective one; it does
> not depend upon the state actor's subjective intent.  To the extent that
> the creation of the [evidence] fulfilled an investigatory purpose, [the
> prosecutor] cannot claim absolute immunity.  The Supreme Court
> points out that investigative work may not be transformed into

_____

[11]  Various cases were cited in Imbler for the proposition that prosecutors cannot behave as investigators and expect to be treated differently from the police. See Briggs v. Goodwin, 186 U.S.App.D.C. 179, 569 F.2d 10, 20 (D.C.Cir.1977), cert. denied, 437 U.S. 904, 98 S. Ct. 3089, 57 L. Ed. 2d 1133 (1978) (citing cases); see, e.g., Ames v. Vavreck, 356 F. Supp. 931, 936-7 (D. Minn. 1973) ("Although a prosecutor is immune from suit for actions taken within the scope of his official capacity as prosecutor, he will be held liable for civil damages if his actions are of a police/investigative or other similar nature and deprive plaintiffs of Constitutional rights."); Apton v. Wilson, 165 U.S. App. D.C. 22,  505 F.2d 83, 91 (1974) ("For prosecuting attorneys an immunity rule has been complicated by the diversity of their functions, with some, such as the presentation of evidence to a grand jury and the conduct of a trial, closely entwined with the judicial process, and others, such as the direction of investigative or law enforcement activity, further removed from judicial scrutiny. Prosecutors have been held to enjoy absolute immunity in connection with those functions in which they participate in the judicial process. However, the same protection has not been available when a claim under civil rights legislation focuses on a prosecutor's actions in the course of directing police investigative activity.") (citations omitted); Guerro v. Mulhearn, 498 F. 2d 1249, 1256 (1st Cir. 1974) ("we note that this absolute immunity does not extend to acts essentially unrelated to the judicial process, i.e., acts done in the prosecutor's investigatory role."); Littleton v. Berbling, 468 F. 2d 389, 410-11 (7th Cir. 1972) ("Nowhere is there any mention of the State's attorney having as one of his 'quasi-judicial' duties the investigation of crimes, which is primarily a police function. It has long been established that police officers have no immunity from civil liability under 42 U.S.C. § 1983. It would be anomalous if the State's attorney's quasi-judicial immunity carried over to situations in which he was acting as a police investigator rather than in his quasi-judicial role.") (citations omitted); Dodd v. Spokane County, Washington, 393 F. 2d 330, 335 (9th Cir. 1968) ("if such acts were committed pursuant to their investigatory duties, then their role is substantially the same as that of policemen or county sheriffs, in which case they have the same defense as indicated above for the defendant county sheriff and deputy sheriffs."); Burkhart v. Saxbe, 397 F. Supp. 499, 503 n.4 (E.D. Pa. 1975) ("In the instant case, it is alleged that Mitchell and Saxbe supervised an investigation, and this is not within the ambit of quasi-judicial immunity."); Lewis v. Brautigam, 227 F.2d 124, 128-29 (5th Cir. 1955).  Since that time, various other decisions have emphasized this aspect of Imbler.  See D'Iorio v. County of Delaware, 447 F.Supp. 229, 235 (E.D. Pa. 1978) (citing cases).

8

        advocacy simply by being characterized as work in preparation for trial. . . .

Hill, 45 F.3d at 662-63.

        Some background facts are important. The Office of the District Attorney has 20 to 24 investigators, and has had roughly this number since Plaintiff's original trial. *Exhibit H, at 68, 69; Exhibit I, at 45.* Indeed, Jordan referred to the fact that he had an investigator *on this case*:

> Q. Who was your investigator?
>
> A. Back then in "Section I," it was Michael Cooney was an investigator. But that doesn't necessarily mean that would have been the investigator that would have been used, it's whoever is available.

*Exhibit I, at 81.* Sometimes he would use an investigator and sometime he would not. *Exhibit I, at 82.* This was merely a question of whether he got around to it.[12]

        Thus, the prosecutor cannot pretend that he was out talking to witnesses because he had no alternative. Indeed, serious legal and ethical problems are created when a prosecutor turns himself into an impeachment witness.[13] Yet the issue is not whether Jordan's action investigating is right or wrong; the question, for him to assert the mighty shield of absolute immunity, is whether he was acting solely in the role of prosecuting attorney.

        The Defendants try to characterize the investigation in this case as solely prepping witnesses prior to trial. However, there is a vast distinction between what might be characterized as witness

---

    [12] Neither was Jordan or Berry limited to the investigative resources of the DA's office. The NOPD also had officers assigned to the DA's office. *Exhibit J, at 58.* In some cases--this one included, *Exhibit I, at 46-47*--the NOPD has done follow up investigation for the prosecutors.

    [13] While Jordan had no idea what the "witness advocate rule" was, *Exhibit I, 195-96*, this does not mean that in violating the rule he was acting within the prosecutorial function. *Ignorantia non excusat*, as so many prosecutors have argued of the criminally accused.

preparation (arguably, under the current case law, a proper trial function of a prosecutor) and venturing out on investigative[14] forays where one rounds up possible witnesses and then convinces them to provide a particular story.

Consider the facts, rather than the Defendants' bald assertions. One instance of investigation occurred with respect to James Rowell. His name does not appear anywhere in the NOPD investigative file, see *Exhibit A*, and Jordan conceded that he received no police report concerning Rowell as a potential witness. *Exhibit I, at 191*. Therefore, he was indisputably located and developed as a witness by the prosecutors in this case. In his testimony at trial, James Rowell stated that Jordan had told him what to say, and that he had effectively been told to commit perjury. See *Exhibit D*. In his affidavit, Rowell confirms and elaborates upon this. See *Exhibit K*. Rowell tells how the prosecutors came to see him several times[15] to get him to tell a false story against Plaintiff.[16] Since the police did not develop Rowell as a witness, the Defendants can have no claim that they were merely preparing witnesses for trial.

Here, Jordan and Berry were acting precisely as police might in recruiting Rowell to the prosecution camp. Tomko v. Lees, 416 F. Supp. 1137, 1139 (W.D. Pa. 1976) ("immunity to which the defendant prosecutors claim entitlement does not extend to their conduct while engaged in such

---

[14] Jordan conceded that with one of the witnesses, at the time he turned the case over to another prosecutor, he "hadn't *investigated* a story. . . ." *Exhibit I, at 161* (emphasis supplied).

[15] Berry confirms that he was present with Jordan for at least one interview with Rowell. *Exhibit J, at 52*. Jordan cannot remember how many times they met. Rowell recalls several meetings.

[16] Of course, there are some clear differences in the various versions of what happened. Jordan's version of events was that Rowell's attorney, George Simno, approached him. *Exhibit I, at 48*. Rowell's version was that Jordan (along with Simno) told him what to say. *Exhibit D*. However, Rowell's version must be accepted as true for purposes of the Defendants' Rule 56 motion.

10

police activities as recruiting or cultivating informants.") (citations omitted). Here, they tried

mightily to get Rowell to tell a story against Plaintiff, so that Plaintiff might be sent to Death Row

at any price. They cannot claim absolute immunity for this. Smith v. Updegraff, 744 F.2d 1354,

1364 (8th Cir. 1984) ("The question we must answer then is whether Whitehead's conduct was within

the scope of his prosecutorial duties. Our review of Smith's complaint and the evidence adduced at

trial satisfies us that Whitehead's conduct was outside the scope of his office. First, Robert Hubbell

testified that Whitehead "hired" him to work undercover to "get Smith no matter what," even if it

meant framing Smith. When Hubbell objected, saying he would not do anything illegal, Whitehead

reiterated that Hubbell was to get Smith any way he could and that no charges would ever be filed

against him by the Jasper County Attorney's Office. Second, Whitehead threatened to prosecute

Smith if he attacked the Sheriff's Office during his discharge hearing before the Civil Service

Commission. We find these examples of Whitehead's conduct more than sufficient to conclude that

Whitehead was acting outside the scope of his prosecutorial duties."); accord Ginter v. Stallcup, 641

F.Supp 939, 964 (E.D. Ark. 1986).

Another such person would be Wayne Cooks whose name, again, does not appear in the

NOPD file. Cooks gives elaborate detail concerning the efforts to which Jordan went to get him to

tell a concededly false story against Plaintiff in this case. See Exhibit E.[17] We must step back and

consider the claim of immunity from another vantage point, whence it is patently clear that Jordan's

argument must fail. Surely Jordan cannot claim the cloak of the prosecutor for his actions with

---

[17] Again, the versions of events vary, and Plaintiff's version must be assumed true. Jordan admitted that he went to Allen Correctional Institution and met with Cooks, and confirmed the basic story given by Cooks. Exhibit I, at 156-57. While he referred to some of Cooks' other allegations as "ridiculous," a jury may well decide that he, Jordan, is the one not telling the truth.

11

Cooks *after he was off the case*. Indeed, he admitted meeting with Cooks after he, Jordan, had got

off the case, and admitted cashing a check for him. *Exhibit I, at 159*.

With another person, Darryl Nathan, nobody but Jordan had anything to do with him. Nathan

had been a client when Jordan was a defense lawyer, *Exhibit I, at 175*, and through him Jordan was

looking into some "extreme allegations" (which, incidentally, where totally false) about the defense

paying off witnesses, and using police to garner illegal evidence. *Exhibit I, at 174 et seq.* No police

officer ever talked to him. *Exhibit I, at 193*.[18] Again, at the very least, the distinction must be drawn

between a prosecutor talking to the police witnesses and accumulating evidence of his own. Taylor

v. Kavanagh, 640 F.2d 450, 452 (2d Cir. 1981) ("The 'investigatory' and 'administrative' work

involved in testifying before a grand jury, *accumulating evidence*, and disseminating information

to the press is analogous to the tasks performed by the police, and therefore only the same qualified

'good faith' immunity is available.") (emphasis supplied).

The claim of immunity fails, also, with respect to witnesses who were developed by the

prosecutors, who could have helped the defense. With respect to the witnesses who could place

Plaintiff at the basketball game that evening, the Defendants try to frame the issue as one of merely

following up on the defense notice of alibi as trial preparation. This is simply not the case.[19] Rather,

the State received a roster of all the players that night, which was to be introduced by the defense

into evidence. *Exhibit I, at 192*; see also *La. C.Cr.P. art. 724* (defense must turn over any

---

[18]  Whether there are more such witnesses will only be known when the defense is
provided with all of the records that the Office of the District Attorney has, and when various
defendants have been deposed. Until that happens, the Defendants cannot prove that this kind of
shocking action falls within the accepted realm of the prosecutorial function.

[19]  Reference to the "Notice of Alibi" filed by the defense in this case, compared to the list
of DA Subpoenas issued by Jordan, makes it clear that this is not the case. However, Jordan
admitted this also in his deposition, so no resort to the record is necessary.

documents "that the defendant intends to use in evidence at the trial"). Jordan then "interviewed as many as we could that were on that list. There was a sheet that has the name of the individuals that played basketball and that were part of the game." *Exhibit I, at 188*; see also *id. at 187*. He met with some witnesses who clearly placed Plaintiff elsewhere when the crime took place. *Exhibit I, at 114*.

The prosecutors cannot even claim absolute immunity with respect to the shenanigans that took place with Connie Babin, who was the victim's date on the night of the crime. Jordan conceded that Babin provided her eye prescription to the prosecution after the first trial. *Exhibit I, at 68*. Jordan stated that he "never inquired about what her unaided acuity was or what it was with glasses." *Exhibit I, at 70*. However, Plaintiff then confronted him with a letter in which Babin had responded to his inquiries as to her "unaided acuities." *Exhibit I, at 71*. Indeed he recalled her sending him materials when he was "already off the case and I probably had forwarded that to Val Solino." *Exhibit I, at 71-72*. The prescription (dated June 14, 1994, despite her prior representation that the prescription was not recorded on that day) was an obvious fake. Nevertheless, this was not turned over to Mr. Cousin's defense until the defense specifically demanded it on September 10, 1998.[20]

Again, on the immunity issue, Jordan's involvement with Babin did not end with his removal from the case. Jordan has been meeting with Babin concerning the case, and helping to secure statements from her, even in the past six months, at least two years after he was taken off the case as a prosecutor. *Exhibit I, at 88*. He certainly cannot claim any kind of immunity for this activity.[21]

---

[20] Even Connick agreed that evidence that Babin had concocted a false prescription to be turned over in discovery would influence his assessment of her credibility as a witness. *Exhibit H, at 73*.

[21] This was not the end of his investigation. Jordan went out to talk to a person who might be a witness, William Tierney, who had not been "cooperating" with the police. *Exhibit I, at 136*. He supposedly went to look for other witnesses who might know something about the case, including Rebecca Tekin, *Exhibit I, at 143-44*, a person who, when the defense later got her

iv. **PURSUING THE DEATH PENALTY AGAINST SHAREEF COUSIN BASED, IN PART, UPON THE COLOR OF HIS SKIN DOES NOT FALL WITHIN THE AMBIT OF THE PROSECUTOR'S FUNCTION**

The Defendants have made no meaningful argument to date that they should receive immunity for discrimination against Shareef Cousin based on the color of his skin in the decision whether to charge him with a capital offense. On the other hand, Plaintiff has certainly gone beyond the bare bones of the allegations in his complaint in this respect. In response to discovery, Plaintiff has turned over evidence that shows a terrible pattern of discrimination in the manner in which Plaintiff was charged capitally.

Of course, it is worth bearing in mind the shocking fact that, going all the way back to Slavery, every child Shareef's age who has ever been executed in Louisiana has been black, accused of killing a white person. See *Plaintiff's Response to Prosecutor Defendants' Request for Documents, at 3*. When Harry Connick sought death for Shareef, he was trying to kill a child of this age for the first time in 50 years:

| ACCUSED'S NAME | RACE | VICTIM RACE | DATE OF EXECUTION |
|---|---|---|---|
| FRANK (A SLAVE) | BLACK | WHITE | AUGUST 24, 1855 |
| JOSEPH (A SLAVE) | BLACK | WHITE | JUNE 15, 1858 |
| WESLEY TURNER | BLACK | WHITE | APRIL 22, 1878 |
| ROBERT CHENEY | BLACK | WHITE | MAY 16, 1879 |
| JIM CONELM | BLACK | WHITE | FEBRUARY 3, 1888 |
| WILLIE FRANCIS | BLACK | WHITE | JUNE 7, 1941 |
| IRVIN MATTIO | BLACK | WHITE | JANUARY 9, 1948 |

name, specifically excluded Plaintiff as the killer.

14

The first two victims were both slaves. Of the two sixteen year old children executed in the last (20th) century, Willie Francis' case went to the Supreme Court on the cruelty of the Electric Chair that ultimately killed him. Irvin Mattio died more than fifty years ago. This might have been a sorry footnote in history had D.A. Harry Connick not sought to seek death anew against Shareef Cousin. Again, Mr. Cousin is black and the victim in the case is white. Never, in the 195 year history of this state, has a white person Shareef's age been executed. Never, in all those 195 years, has anyone Shareef's age been executed for a crime against a black person.

Looking to the indictments over the five years leading up to Mr. Cousin's charge, the probability that 66.1% of relevant black-on-white victim crimes were indicted as first degree, compared to only 29.4% of black-on-black crimes is significant at less that one chance in one thousand. *Exhibit M.*[22]

If Defendants want us to believe that there is no discrimination going on here, there had better be a rather good explanation. While the Defendants seem to want a specially high standard of proof for claims of racism, such arguments have already been rejected. The burden is placed on the Plaintiff is already sufficient. In <u>Crawford-El v. Britton</u>, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998), for example, the Supreme Court made clear that there can be no requirement of heightened proof in racial discrimination claims, <u>id.</u> at 594, 118 S.Ct. at 1595, since there are already sufficiently high mountains to climb:

---

[22] We would be marginally heartened were there no other indicators of racial discrimination against Mr. Cousin, but sadly this is not the case. For example, at his trial, when the defense raised the <u>Batson</u> issue, the prosecution had excluded black citizens from the jury with *nine of the ten peremptory challenges which it had exercised up to that point.* (Tr. XIVB 360) Ultimately, the state used *all but one* of all of the fourteen peremptory challenges exercised to exclude black citizens from the jury. While jury selection may be an issue for which the prosecutors are themselves immune, that does not mean that their racist actions are not evidence of the earlier acts for which no immunity exists.

When a plaintiff files a complaint against a public official alleging a claim that requires proof of wrongful motive, the trial court must * * * determine whether, assuming the truth of the plaintiff's allegations, the official's conduct violated clearly established law.

Id. at 5984, 118 S.Ct. at 1596-97; see also Kimble v. McDuffy, 623 F.2d 1060 (5th Cir. 1980).

> **v.    CONSPIRING TO PREVENT THE DISSEMINATION OF MATERIAL THAT SHOULD BE PROVIDED TO THE ACCUSED IN A CAPITAL CASE DOES NOT FALL WITHIN THE AMBIT OF THE PROSECUTOR'S FUNCTION**

One matter that has been revealed through discovery is the fact that D.A. Connick and his staff have got together outside the courtroom, and in training programs within the office, to agree on a false standard for turning over evidence to the defense. In his deposition, Mr. Connick stated:

Q. And by "exculpatory evidence," what do you mean by that?

A. Evidence that demonstrates that he's not guilty of the crime with which he is charged.

*Exhibit H, at 7* (Deposition of Harry Connick). This was confirmed by Byron Berry, who said it had to be "[i]nfomation that negates the guilt of the offender. . . ." *Exhibit J, at 18.*[23]

In Imbler v. Pachtman, 424 U.S. 409, 422, 96 S. Ct. 984, 991 (1976), the Court noted a clear exception to the rule:

We have no occasion to consider whether life or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of *an administrator* or investigative officer rather than that of an advocate. We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from civil suit for damages under *§ 1983*.

Imbler, 424 U.S. at 430-31, 96 S. Ct. at 995 (emphasis supplied).

---

[23] There is not only no doubt that the prosecutors knew the evidence was "favorable" to the defense, but it is patently obvious from the record of the case that Berry and Jordan discussed how to deal with Babin's inability to make an identification on the night of the crime. *Exhibit J, at 64-68.* They specifically discussed her glasses and when she wore them. *Exhibit J, at 70.*

16

Here, Connick and his assistants get together, as part of his "administration" of the office, and effectively conspire to violate the rights of the accused in pending cases, and cases unknown in the future. This should not be immunized from review.

vi.    **IS THERE NOT A LEVEL AT WHICH THE MANIFEST AND REPEATED VIOLATION OF THE RIGHT TO A FAIR TRIAL MUST FALL OUTSIDE THE AMBIT OF THE PROSECUTOR'S ABSOLUTE IMMUNITY?**

Plaintiff must concede that individual acts of suppressing evidence have, since *Imbler*, been viewed as immune from civil liability. However, it is important to analyze the conceptual underpinnings of this. The fear that undergirds Imbler is the idea that "harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." Id. at 423, 96 S.Ct. at 991.

To the extent that Imbler sets its roots in fertile soil–and it has been much criticized–the logic of the case still comes to a grinding halt when faced with a case as shocking at this one. No honest prosecutor could possibly doubt that the evidence in the hands of the prosecution here should have been turned over.

An analogy may be drawn from double jeopardy law. An individual act of misconduct will not result in a double jeopardy bar to a retrial, but there comes a point when the prosecutor's actions are so rampant that the conduct "shocks the conscience" and precipitates a double jeopardy claim. See, e.g., United States v. Dinitz, 424 U.S. 600, 611, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976) (reprosecution may be precluded by "'bad-faith conduct by judge or prosecutor'" which "threatens the '[h]arrassment of an accused by successive prosecutions. . . .'").

The same "shock the conscience" exception must be read into Imbler. See, e.g., Ginter v.

17

Stallcup, 641 F.Supp 939, 964 (E.D. Ark. 1986) (noting that "Justice White's concurrence in *Imbler* cautioned that a prosecutor who intentionally withheld important evidence might not be entitled to absolute immunity."). Where, as here, the actions of the prosecution have been taken in manifest bad faith, the principles at the root of Imbler evaporate, while a deep concern for the integrity of the judicial system, and the rights of the accused, surge to the surface.

Here, even Connick admitted that evidence of "other suspects," "the license plate of the perpetrators as they left," "the names of witnesses who saw the crime and specifically say it is not Shareef Cousin," "statements by an eyewitness where ... the eyewitness says that she couldn't identify the people," and "evidence that a police officer committed perjury in the warrant to secure the arrest of the subject" were all things that should have been turned over. *Exhibit H, at 30-31.*

For the most part Jordan and Berry hid behind a Clinton-esque refusal to "speculate" as to whether this kind of information should properly be given over. See, e.g., *Exhibit I, at 54 et seq.* This merely illustrated their bad faith, and the knowledge that to admit the truth would expose them to liability. When pressed, Jordan admitted that he had the license number of the perpetrators' car, *Exhibit I, at 52,* one fact that was not turned over. He knew that James Rowell, a witness against Mr. Cousin at the first trial, had denied being involved in the homicide in any way, *Exhibit I, at 58,* but would not speculate whether this would mandate disclosure that Rowell had been identified as one of the perpetrators of the homicide. Ultimately, Jordan and Berry could not hide from the fact that they had access to everything in the supplemental police report. *Exhibit I, at 53, 127.*

A review of the report, *Exhibit A, at 005-054,* along with the rest of the statements that were in the DA's file and suppressed, *Exhibit A, passim,* reflects all of the exculpatory material that Connick said should clearly have been turned over. The allegations in Plaintiff's complaint are absolutely supported by these documents, and they are too numerous to repeat here: Beginning with

18

the smoking gun of Connie Babin's "no glasses" statement,[24] her perjury[25] and other critical

statements concerning her description,[26] and moving through the statements of eyewitness Alphonso

Larkins,[27] to the consistent perjury of Det. Small in his warrant affidavit,[28] and beyond. Perhaps

more shocking than this, there was a list of more than a dozen other suspects identified by the police,

including James Rowell a witness against Plaintiff at his first trial. This list, elaborated in the police

report, included the names of two men whose car had been identified as driving from the crime

scene, who were identified by a Crimestopper tip as the perpetrators, and who had been taken into

---

[24] See State v. Shareef Cousin, No. 96-KA-2973 (La. 4/14/98), 710 So.2d 1065 (the Court notes that "[t]he prosecutor did not disclose this **obviously exculpatory statement** to the defense prior to the trial, as required by Brady v. Maryland, 373 U.S. 83 (1963), and Kyles v. Whitley, 514 U.S. 419 (1995)") (emphasis supplied).

[25] To give just one of many examples, she testified at trial regarding the clothes that the individual was wearing: "I never described it as a blue jean jacket." (Tr. XVII at 171) We now know that she had told the police that it was "a large like an oversized, like a denim jacket. . . ." (*Suppressed March 5, 1995, Statement at 3*) A denim jacket is a blue jean jacket.

[26] Jordan admitted in deposition that he thought an old man would be 80 years old–which patently does not fit the 16 year old Mr. Cousin. Babin said that she was not sure she had not confabulated this anyway: "I keep getting this vision of a young man with, with an older man's face . . . er, *I don't know if this is coming . . . er somewhere, or if I really did see this person . . . if this is just coming from my imagination or what . . . .*" (*Suppressed March 5, 1995, Statement at 3*) (emphasis supplied).

[27] In his statement, Larkins is asked:

Q. Okay now you also mentioned the fact that uh that *possibly could be the person, he looked something like 'em*?

A. *Yeah, but like I say I really didn't look at his face.* I was so busy watching him tied his show. It's just when I look at him I get like a chill.

*Exhibit A, at 209.* Some positive identification!

[28] Judge Dennis Waldron found these facts to be false and made a finding of perjury in the preparation of the warrant affidavit by Defendant Small. See *Exhibit G.*

19

custody by Det. Mims. See *Exhibit A, at 328.*

This court should find that there is an exception to Imbler for cases of such manifest and shocking misconduct as here.

### IV.    ON THE ISSUE OF HARRY CONNICK'S LIABILITY, PLAINTIFF VIGOROUSLY DISPUTES THE "FACTS" SET FORTH IN THE DEFENDANTS' PLEADING AND AFFIDAVITS

The issue of Defendant Connick's liability is focused largely on his claim that he has vigorously tried to prevent *Brady* violations and other prosecutorial misconduct. This is, sadly, something of a bitter joke at Tulane & Broad. While Connick testified that he would always write to the Bar where he found an ethical violation, *Exhibit H, at 14*, he was forced to admit that he had never done it but once, in the *Thompson* case. *Id. at 14-15*; see also *Memorandum, Exhibit 5, ¶15.* The hypocrisy of this action was rather stark. He reported three lawyers who no longer worked for him. He reported one lawyer for failing to report a discovery violation committed by one of his own prosecutors fast enough, even though he–Connick–has never reported any of his own staff for the multitude of *Brady* violations that have taken place on his watch. He reported another of his former assistants, the screening lawyer, for failing to order serology testing prior to trial–when the same thing happens on a routine basis in his office, and has *never* resulted in any report or sanction against his staff. See *Exhibit L* (Affidavit of Bruce Whittaker). Furthermore this, the only report that Connick made, came years after Plaintiff's trial.

The rest of Connick's evidence, rather than buttress his claim of careful and constitutional supervision, painted a picture of Lord Nelson turning his blind eye every time misconduct might happen. Despite the fact that on January 10, 2000, he was sent a complaint detailing this case, and despite the Louisiana Supreme Court's statement that "[t]he prosecutor did not disclose this **obviously exculpatory statement** to the defense prior to the trial, as required by Brady v. Maryland,

20

373 U.S. 83 (1963), and <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995)"[29] in this case, he testified that he was not aware that his office had "ever had anyone not comply with the policy" of turning over discovery. *Exhibit H, at 19-20.* In truth, he had simply never asked.[30]

He has not even been forthright in public when he has said that he takes steps to redress the problems in his office. In public, Connick said to the newspaper that Jordan had "been disciplined internally." *Exhibit H, at 35.* In truth, he testified that actually he had not "applied any sanctions in this case." *Exhibit H, at 33.* Indeed, Jordan was not even told he had done wrong in any way. *Exhibit I, at 29.* Far from being disciplined, Jordan was promoted, and his salary radically increased from roughly $40,000 at the time he got involved in the Cousin case in 1995 to $54,000 today. *Exhibit I, at 19-20.* In the meantime, he was promoted to deputy chief of the Gang Strike Force. *Exhibit I, at 18.*

On one level, Connick's assertion that he is unaware that anyone failed to comply with the "policy" of turning over discovery was patently not true. He admitted that his own office had conducted a review of cases reversed for *Brady* violations that was commissioned in September 1997, *Exhibit H, at 23*, which was precisely when he was criticized in the *Times-Picayune* for failing to make disclosures in Mr. Cousin's case. Despite this study, Connick could not remember any cases where he had actually conducted a meaningful investigation into allegations of *Brady* violations. *Exhibit H, at 50.* Plaintiff listed a number of cases that had been reversed, publically, for *Brady* violations, but he denied that this was evidence of misconduct on the part of his assistants.

When an appellate court finds a patent *Brady* violation in his office, the most Connick does

---

[29] State v. Shareef Cousin, No. 96-KA-2973 (La. 4/14/98), 710 So.2d 1065.

[30] He did not even know that Jordan had weighed turning over the Babin statement, and actively chose not to do so. *Exhibit H, at 56.*

21

is to ask his assistant what happened.  For example, in one case where the prosecutor suppressed information found to be "crucial to Rosiere's defense", Connick simply accepted his assistant's assertion that "he felt perfectly comfortable with what he did." *Exhibit H, at 44, 45*.  He simply spurns the courts' rulings:

> Q. How do you reconcile his opinion with the fact that the Supreme Court held directly otherwise?
>
> A. Well, I don't always agree with the Supreme Court. . . .

*Exhibit H, at 45.*[31]

The proof of his total lack of meaningful training and discipline is apparent from his assistants.[32]  Despite the fact that the Supreme Court of Louisiana expressly said otherwise, both Jordan, *Exhibit I, at 60*, and Berry, *Exhibit J, at 34-36*,[33] denied that the suppressed the Babin statement was "exculpatory."  Indeed, Jordan said that he had not "made any errors, . . . violated [Plaintiff's] Constitutional Rights in any way." *Exhibit I, at 77*.  This, despite the fact that the Louisiana Supreme Court unanimously ruled that his handling of the James Rowell issue had been a manifest error that violated Plaintiff's rights in a number of ways.

Connick cannot be allowed immunity of any sort.  To pretend that he can rely on the policies that he allegedly set, but then never followed, has no support in the law. See, e.g. Crane v. Texas,

---

[31] On the other hand, the appellate courts are apparently "correct" when they side with the prosecution. *Exhibit J, at 49.*

[32] Jordan had been in public trouble before with the *Walker* case, where a motion for a new trial was granted based on suppression of evidence. *Exhibit I, at 184*.  He was found to have failed to turn over exculpatory evidence in the *Smith* retrial. He has subsequently been in more trouble in the *Laugand* case.

[33] Berry explicitly conceded that he reviewed the Babin statement too. *Exhibit J, at 61-62.*

759 F.2d 412, 430-31 (5th Cir.), <u>modified</u> 766 F.2d 193 (5th Cir.), <u>cert denied sub nom</u>, <u>Wade v.</u> <u>Crane</u>, 474 U.S. 1020 (1985) ("The obvious flaw in this reasoning is that the statute quoted above has no application to actions taken by the District Attorney in the exercise of his discretionary authority. Where, as here, the District Attorney *himself* established the procedures to be followed by the County in issuing misdemeanor capias, the statute does not and could not apply unless it were construed to require a County official to ask the District Attorney to provide legal advice to himself about his own system. The suggestion is not plausible. * * * We therefore hold the District Attorney liable for the damages awarded by the jury and assessed against him.").

## CONCLUSION

Wherefore, Plaintiff respectfully moves that the issue of summary judgment and the Defendants' motion to dismiss be denied.

Respectfully Submitted,

CLIVE A. STAFFORD SMITH
La. Bar No. 14444
636 Baronne Street
New Orleans, La. 70113
(504) 558-9867

Attorney for the Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing pleading upon the following by hand:

Albert Thibodeaux
Office of the City Attorney
1300 Perdido Street, 5th Floor East
New Orleans, La. 70112

23

William F. Wessel
127 Camp Street
New Orleans, La. 70130-2507

Done this 14th day of February, 2001.

24

# APPENDIX

*The following documents were submitted with the original opposition:*

A.    New Orleans Police Department Homicide Case File (numbered 001-416)

B.    Connie Babin eye prescription materials provided by the Office of the District Attorney (13379-84)

C.    Actual Connie Babin Driver's License information received from Louisiana Department of Transportation

D.    Trial testimony of James Rowell.

E.    Affidavit of Danalynn Recer[34]

F.    Transcript of Motion for New Trial.[35]

G.    Judge Waldron's finding that the Arrest Warrant should be suppressed under *Franks v. Delaware.*

*Additional submissions with this pleading:*

H.    Deposition of Harry Connick.

I.    Deposition of Roger Jordan.

J.    Deposition of Byron Berry.

K.    Affidavit of James Rowell

L.    Affidavit of Bruce Whittaker.

M.    Statistical study of racial discrimination

N.    Affidavit of Clifford Koonce.

---

[34] This affidavit had a typographic error concerning the date of the crime, which was March 2, 1995, not March 22, 1995. It has been conformed.

[35] Various portions of this that were pertinent to the issues discussed in this pleading were referenced and authenticated in the depositions of Kern Reese and Willard Hill.

# SEE RECORD FOR
# EXHIBITS
# OR
# ATTACHMENTS
# NOT SCANNED