**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED APR 15 2003
LORETTA G. WHYTE
CLERK

No. 01-30745

D.C. Docket No. 00-CV-69-R

U.S. COURT OF APPEALS
FILED
MAR 24 2003
CHARLES R. FULBRUGE II
CLERK

SHAREEF COUSIN

    Plaintiff - Appellant

v.

ANTHONY SMALL; ET AL

    Defendants

BYRON BERRY; ROGER JORDAN; HARRY CONNICK, Individually and in his capacity as District Attorney for Orleans Parish

    Defendants - Appellees

Appeal from the United States District Court for the Eastern District of Louisiana, New Orleans.

Before SMITH, BENAVIDES, Circuit Judges, and FITZWATER,* District Judge.

J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is affirmed.

ISSUED AS MANDATE: **APR 15 2003**

---

    * District Judge of the Northern District of Texas, sitting by designation.

A true copy
Test
Clerk, U.S. Court of Appeals, Fifth Circuit
By _____ Deputy
New Orleans, Louisiana   APR 15 2003

REVISED MARCH 27, 2003

# In the
# United States Court of Appeals
## for the Fifth Circuit

U.S. COURT OF APPEALS
**FILED**

N° 01-30745

MAR 2 4 2003

CV - 00-69 - R

CHARLES R. FULBRUGE III
CLERK

SHAREEF COUSIN,

Plaintiff-Appellant,

VERSUS

ANTHONY SMALL, ET AL.,

Defendants,

BYRON BERRY, ROGER JORDAN,
AND HARRY CONNICK,
INDIVIDUALLY AND IN HIS CAPACITY AS DISTRICT ATTORNEY FOR ORLEANS PARISH,

Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before SMITH and BENAVIDES, Circuit Judges, and FITZWATER,[*] District Judge.

PER CURIAM:

Shareef Cousin sued employees of the police department and the district attorney's office, alleging various violations of his constitutional rights in connection with his prosecution for the murder of Michael Gerardi. The district court found for defendants on immunity grounds. Finding no error, we affirm.

I.

On March 2, 1995, Gerardi and Connie Babin emerged from dinner at a New Orleans restaurant. As they neared Gerardi's car, three black men approached and robbed them; one of the men confronted Gerardi and fatally shot him.

Later that month, Cousin, then sixteen years old, was charged with the murder. At trial, the state relied solely on testimonial evidence, including Babin's identification of Cousin as the perpetrator. The prosecution also presented testimony from witnesses who claimed to have seen three black men in the vicinity of the crime. At a photo line-up three weeks after the murder, two of these witnesses tentatively had identified Cousin as one of the three men.

Finally, the state presented the testimony of James Rowell, a friend of Cousin's. The prosecution claimed in its opening statement that in August 1995 Rowell had told police of a conversation he had with Cousin in March 1995, in which Cousin admitted to killing a man in the New Orleans French Quarter during an unsuccessful armed robbery. When called to testify, however, Rowell denied that Cousin had made such a statement and claimed that his assertions had been coerced by promises of favorable treatment on pending charges.

The prosecution then called, as impeachment witnesses as to what Rowell had told police regarding Cousin, the attorney who had represented Rowell on the pending charges and a police officer who was present at the August 1995 meeting. The prosecution later relied on this impeachment testimony as substantive evidence of Cousin's guilt.

The defense presented evidence that at the time of the murder, approximately 10:26 p.m., Cousin was playing in a city recreation department basketball game. Two recreation department supervisors, Cousin's coach, and an opposing team's player testified that the game had started late and ended late, and the coach testified that he dropped Cousin off at his house at approximately 10:45 p.m.

The jury convicted Cousin and sentenced him to death. Cousin spent over a year on death row, but the conviction was overturned for prosecutorial misconduct. *State v. Cousin*, 710 So. 2d 1065 (La. 1998).[1] The court based

---

[*] District Judge of the Northern District of Texas, sitting by designation.

[1] In his opening brief on appeal, Cousin, without citation to the instant record, makes the following assertion:

> The prosecutorial misconduct identified by the Louisiana Supreme Court . . . turned out to be the tip of the iceberg. Indeed, the arrest and conviction were the product of a sustained campaign to frame Cousin. A significant part of that effort involved unlawful and unconstitutional ac-
> (continued...)

2

its reversal on the admission of the testimony of Rowell's attorney and the police officer as impeachment evidence, holding that "even if the issue of admissibility was close, we would be compelled to reverse this conviction because of the prosecutor's flagrant misuse of that evidence for purposes that the prosecutor himself admitted was an improper use of such evidence" (i.e. the misuse of the testimony as substantive evidence of guilt). *Id.* at 1072.

The court also noted that Jordan had withheld obviously exculpatory material, although the court did not base its judgment on that conduct. *Id.* at 1067 n.2, 1074 n.8. The court explained that, when questioned on the night of the murder, Babin told the police that she did not get a good look at the gunman and probably would not be able to identify him. She also stated, in an interview three days later, that she was not wearing her corrective lenses on the night of the murder and could see only patterns and shapes. The prosecutors did not disclose these statements to the defense, even though the statements would have cast serious doubt on the veracity of Babin's subsequent identification of Cousin.

---

[1](...continued)
tions by numerous officers of the New Orleans Police Department. For the most part, the specifics of thse actions are not directly before this Court because they support claims against other defendants in the case—police officers—who are not entitled to absolute immunity, and whose cases remain in the district court.

We express no view on the accuracy of this statement, except to agree with Cousin that our disposition of the appeal by the current appellants is not intended to affect any ongoing proceeding against certain police officers.

The state thereafter announced its intention to retry Cousin, but eventually, in January 1999, it dismissed all charges. One year later, Cousin filed the present action under 42 U.S.C. §§ 1983 and 1985, alleging misconduct by the police and the prosecution. Cousin charged that, from the outset, he was the victim of an effort to frame him for the murder and that the police had engaged in numerous instances of misconduct in an effort to manufacture a case against him. Cousin also contended that the prosecutors, Byron Berry and Roger Jordan, had abused their positions in an effort wrongfully to secure his conviction. Cousin also brought claims against the district attorney, Harry Connick, seeking to hold him liable for the alleged failure adequately to train and supervise the prosecutors in his office.

Berry, Jordan, and Connick moved to dismiss the claims under FED. R. CIV. P. 12(b)(6) or for summary judgment. The district court granted the motions, holding that Berry and Jordan were protected by the doctrine of absolute prosecutorial immunity and that Connick was entitled to summary judgment because the claims against him were barred on grounds of qualified immunity. The judgment did not dispose of Cousin's claims against the police defendants, which have been stayed pending the resolution of this appeal.

II.

Defendants claim this court lacks jurisdiction over the instant appeal. After the district court granted the motions for dismissal and summary judgment, Cousin filed a notice of appeal. The judgment did not dispose of all defendants, and when Cousin filed his notice, the court had not yet issued an unequivocal certification under FED. R. CIV. P. 54(b). Cousin requested, and the court issued, a rule 54(b) final judgment *nunc pro tunc*. Defen-

dants contend that Cousin's notice of appeal is defective because it was filed before the court entered the rule 54(b) judgment and that, as a result, we lack appellate jurisdiction. We disagree.

"A notice of appeal filed after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry." FED. R. APP. P. 4(a)(2). Under rule 4(a)(2), an appeal from a nonfinal decision may serve as an effective notice of appeal from a subsequently entered final judgment if the nonfinal decision "*would be* appealable if immediately followed by the entry of judgment." *FirsTier Mortg. Co. v. Investors Mortg. Ins. Co.*, 498 U.S. 269, 276 (1991).

This court has applied the *FirsTier* rule in the context of the entry of a rule 54(b) certification after a prematurely filed notice of appeal, precisely the situation presented by this case. *Barrett v. Atl. Richfield Co.*, 95 F.3d 375 (5th Cir. 1996). "Because the district court's order would have been appealable if followed by Rule 54(b) certification and order, rule 4(a)(2) permits this court to exercise its jurisdiction," where a final judgment was actually entered subsequent to the filing of the notice of appeal. *Id.* at 379. Under *Barrett*, therefore, we have jurisdiction.

### III.

Cousin challenges the dismissal of his § 1983 claims against prosecutors Berry and Jordan on the basis of absolute prosecutorial immunity. We review dismissals under rule 12(b)(6) *de novo*, accepting all well-pleaded facts as true. *Morin v. Moore*, 309 F.3d 316, 319 (5th Cir. 2002).

Section 1983 creates a damages remedy for the violation of federal constitutional or statutory rights. Although the section contains no reference to official immunity, "Congress intended the statute to be construed in the light of common-law principles that were well settled at the time of its enactment." *Kalina v. Fletcher*, 522 U.S. 118, 123 (1997) (citing *Tenney v. Brandhove*, 341 U.S. 367 (1951); *Briscoe v. LaHue*, 460 U.S. 325, 330 (1983)). Therefore, the immunities existing at common law at the time of § 1983's enactment are applicable to actions brought under it.

In *Imbler v. Pachtman*, 424 U.S. 409 (1976), the Court held that prosecutors are shielded from liability under § 1983 for certain conduct. After analyzing the absolute immunity afforded prosecutors at common law, the Court concluded that the policy underlying that immunity supports its application to § 1983 claims. *Id.* at 427. Consequently, "prosecutors are absolutely immune from liability under § 1983 for their conduct in 'initiating a prosecution and in presenting the State's case,' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process[.]'"[2]

The prosecutorial immunity recognized in *Imbler*, however, does not apply to any and all actions taken by a prosecutor. Rather, the Court fashioned a functional test under which prosecutors are absolutely immune with respect to activities that are "intimately associated with the judicial phase of the criminal process." *Id.* at 430. Conduct falling within this category is not limited "only to the act of initiation itself and to conduct occurring in the courtroom," *Buckley v. Fitzsimmons*, 509 U.S. 259, 272 (1993), but instead includes all ac-

---

[2] *Burns v. Reed*, 500 U.S. 478, 486 (1991) (citations omitted) (quoting *Imbler*, 424 U.S. at 430-31).

4

tions "which occur in the course of [the prosecutor's] role as an advocate for the State," *id.* at 273.

Therefore, the central question with respect to each of Cousin's claims against Berry and Jordan is the nature of the conduct upon which the claim is based. If the conduct is advocatory, and therefore related to the defendants' prosecutorial function, absolute immunity applies, and the district court's rejection of the claim was not error.

### A.

Cousin maintains that Berry and Jordan coerced and intimidated Rowell so that he would give false trial testimony that would implicate Cousin in the Gerardi murder. There is no indication in Cousin's complaint, however, that he alleged a coerced testimony claim concerning Rowell. Although this complete failure seems logically to support dismissal for failure to state a claim, defendants appear to have assumed, in moving for dismissal or summary judgment, that Cousin had asserted such a claim; they did not seek dismissal on the ground that he had not. And Cousin and defendants briefed the claim as though it had been pleaded. We therefore will not affirm on the basis of rule 12(b)(6). Defendants, however, also moved for summary judgment, which we conclude is warranted, because the record establishes that Jordan and Berry[3] were acting as advocates.

---

[3] Because the summary judgment evidence shows that Berry's involvement was exceedingly limited, we restrict our discussion to Jordan. Rowell did not refer to Berry in his declaration; in his trial testimony, he stated that, on one occasion, another district attorney had accompanied Jordan to meet with him. Although Rowell could not identify the individual, Berry confirmed, in his de-
(continued...)

### 1.

At the summary judgment stage of a § 1983 action, a defendant asserting immunity is not required to establish the defense beyond peradventure, as he would have to do for other affirmative defenses.[4] "The moving party is not required to put forth evidence to meet its summary judgment burden for a claim of immunity. It is sufficient that the movant in good faith pleads that it is entitled to absolute or qualified immunity." *Beck v. Tex. Bd. of Dental Exam'rs*, 204 F.3d 629, 633 (5th Cir. 2000). "Once the [movant] *asserts* this affirmative defense, the burden *shifts* to the plaintiff to rebut it." *Id.* at 633-34 (quoting *Whatley v. Philo*, 817 F.2d 19, 20 (5th Cir.1987)) (internal quotation marks omitted).

Defendants asserted, in their summary judgment motion, that they are entitled to absolute immunity. Accordingly, the burden shifted to Cousin to introduce summary judgment evidence that would permit a reasonable trier of fact to find that, when Jordan allegedly told Rowell to lie, Jordan was functioning as the equivalent of a detective rather than as an

---

[3](...continued)
position, that he had been present once when Jordan and Rowell met.

[4] *Cf. Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002) ("To obtain summary judgment, 'if the movant bears the burden of proof on an issue . . . because . . . as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the . . . defense to warrant judgment in his favor.'" (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)) (omissions in original)).

advocate preparing for trial.[5]

### 2.

Citing *Buckley*, Cousin contends that the interrogation of Rowell constitutes investigatory activity, because Jordan was seeking to acquire evidence for later presentation at trial. In *Buckley*, 509 U.S. at 274, however, the prosecutors sought to develop evidence, in the absence of probable cause, to arrest the suspect or initiate judicial proceedings. Although *Buckley* did not explicitly hold that all witness interviews conducted after indictment are advocatory in nature, the Court's reasoning strongly indicates that many, perhaps most, such interviews are likely to be advocatory rather than investigative.

In *Buckley*, the Court focused on the lack of probable cause to arrest the suspect as an indication of the investigative nature of the prosecutors' conduct and noted that "[a] prosecutor neither is nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Id.* The necessary implication is that after probable cause has been established, it is more likely that the prosecutor acts as an advocate. Although the Court noted that a determination of probable cause "does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards," *id.* at 274 n.5, the Court's treatment of the issue demonstrates that the existence of probable cause with respect to a particular suspect is a significant factor to be used in evaluating the advocatory nature of prosecutorial conduct.[6]

"There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand." *Id.* at 273. In this case, therefore, the question of absolute immunity turns on whether Cousin had been identified as a suspect at the time Rowell was interviewed and whether the interview related to testimony to be presented at trial.

In response to the summary judgment motion, Cousin cited Rowell's trial testimony[7]

---

[5] *See Buckley*, 509 U.S. at 273 ("We have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity.").

[6] Cousin cites *Moore v. Valder*, 65 F.3d 189, 194 (D.C. Cir. 1996), which held that absolute immunity is inapplicable with respect to allegations of witness tampering, because such activity is directed at "the collection of information to be used in a prosecution." *Moore*, however, is inconsistent with *Brandley v. Keeshan*, 64 F.3d 196, 201 (5th Cir. 1995), in which we held that the prosecutor retained his absolute immunity even in the face of allegations that he had directed the intimidation of witnesses in an effort to suppress their testimony. Further, the conclusion of the District of Columbia Circuit, in *Moore*, that the collection of information for use in a prosecution is necessarily investigative rather than advocatory conduct demonstrates a much narrower conception of the advocatory role than is justified by *Imbler*, in which the Court explicitly recognized that "[p]reparation, both for the initiation of the criminal process and for a trial, may require the *obtaining*, reviewing, and evaluating of evidence." *Imbler*, 424 U.S. at 431 n.33 (emphasis added).

[7] Rowell's trial testimony included an in-
(continued...)

6

and a declaration from Rowell. Rowell's trial testimony addresses in detail his allegations that prosecutor Jordan and his defense counsel, George Simino, told him to lie about Cousin to avoid a lengthy sentence for armed robbery.

It is uncertain from this evidence whether Cousin had already been charged or arrested at the time of the events alleged. On the one hand, Rowell seemed to aver that Simino and Jordan had given him these instructions after Cousin had already been charged with murder.[8] On the other hand, Rowell testified that when he spoke with two homicide detectives, he had already been told to lie.[9] This suggests that Jordan was still functioning as an investigator, and it might permit a reasonable trier of fact to find in Cousin's favor on the immunity issue.

Rowell's declaration, however, eliminates

---

[7](...continued)
chambers conference that involved the state court, counsel for the parties, and Rowell. The conference appeared to relate primarily to admonitions from the court and from counsel that Rowell not cause a mistrial by testifying about other bad acts that Cousin had committed. Rowell foreshadowed in chambers, however, what he would later assert in court: that the district attorney and Rowell's attorney had instructed him to implicate Cousin falsely.

[8] Rowell testified, "My lawyer came to me with a file, and he said the only [w]ay I can get you lesser time is if I testify against Shareef Cousin on a murder charge."

[9] The colloquy was as follows: "[Question:] Now, do you also remember telling homicide detectives . . . about this conversation you had with Shareef Cousin on March 4, 1995? [Answer:] I only told them what you all told me to say."

this ambiguity and establishes, without genuine dispute, that Jordan was functioning as an advocate when he allegedly instructed Rowell to lie. Rowell makes it plain that, before he and Jordan ever met, he had already talked to the police, Simino had already advised him that he "needed to give up Shareef on the murder," and Jordan had already talked with Simino. It also demonstrates that, when Jordan met with Rowell, he did so to tell him how he should testify in court and to rehearse his testimony with him. Rowell stated, in relevant part:

> 2. *In my initial statements to the police,* I never said nothing in that statement about no murder because I didn't know anything about it. *Later,* George Simno [*sic*], my lawyer, came to me and told me I was looking at a [sic] 800 years unless I had something for them on Shareef committing the murder. Simno told me, "then you'd get 15 years, otherwise life." I argued about taking the 15 years and being able to tell them nothing since I did not know anything. Simno insisted, "you need to give up Shareef on the murder to get the 15 years." It was clear from this exchange that *he had talked to the prosecutor (who turned out to be Jordan) before he ever brought the issue up with me.*
>
> 3. *I met with Roger Jordan two times. Jordan provided me with the questions I would be asked in court and the answers*, always telling me "the main thing is just to emphasize how Shareef was bragging to you all about doing the murder." During the time before trial, I was housed at OPP and would get "attorney visit" callouts. I would be escorted to a visitation room

7

at OPP and find Jordan waiting for me there. *We would practice what I should say there.*

\* \* \*

5. Jordan told me to lie about whether I had a deal with the State. But I knew that the reason my sentencing date kept getting moved back was to make sure that it would occur after the trial date, so they could hold that over me. I knew I had a deal, and they knew it too. If I testified for them, I would get 15 years. Jordan tried to get me to lie on a number of points. He was not asking me what I was going to say; he was telling me what to say.

\* \* \*

(Emphasis added.)

The record therefore demonstrates that, at the time of Jordan's (and of Simino's) conversations with Rowell, in which Jordan allegedly told Rowell to implicate Cousin falsely in the murder and coached him on how to testify, Jordan was acting as an advocate rather than as an investigator. The interview was intended to secure evidence that would be used in the presentation of the state's case at the pending trial of an already identified suspect, not to identify a suspect or establish probable cause.[10] Jordan therefore is entitled to absolute immunity with respect to this claim.

B.

Cousin alleges that the prosecution suppressed significant exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Cousin notes Berry's and Jordan's failure to disclose that Babin, the witness who identified Cousin as the perpetrator, had poor vision and was not wearing her glasses or contacts at the time of the murder and that, as a result, her subsequent identification of Cousin was suspect. Cousin also alleges that the prosecutors failed to disclose information linking other potential suspects to the crime. Although these allegations, if true, would establish prosecutorial misconduct, the suppression of exculpatory evidence is shielded by absolute immunity.[11]

Cousin concedes that absolute immunity generally applies to *Brady* violations, but he notes that prosecutors are not shielded from liability for conduct beyond the scope of their jurisdiction; he contends that, in cases of drastic and systematic departure from the proper exercise of prosecutorial power, prosecutors should be deemed to have acted without jurisdiction. In effect, Cousin argues for an egregiousness exception to the doctrine of prosecutorial immunity.

For purposes of immunity determinations, however, the presence or absence of jurisdiction is determined with reference to whether

---

[10] *See Hill v. City of New York*, 45 F.3d 653, 662-63 (2d Cir. 1995) (holding that the existence of probable cause determines whether fabrication is investigatory or advocatory); *see also Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001) (holding fabrication not protected because no (continued...)

[10](...continued)
probable cause).

[11] *See Henzel v. Gerstein*, 608 F.2d 654, 657 (5th Cir. 1979); *see also Reid v. New Hampshire*, 56 F.3d 332, 336 (1st Cir. 1995); *Robinson v. Volkswagenwerk AG*, 940 F.2d 1369, 1373 n.4 (10th Cir. 1991).

8

the challenged activity falls within the category of conduct in which a prosecutor is generally authorized to engage, rather than with reference to the wrongful nature or excessiveness of the conduct.[12] Wilful or malicious prosecutorial misconduct is egregious by definition, yet prosecutors are absolutely immune from liability for such conduct if it occurs in the exercise of their advocacy function. *See Imbler*, 424 U.S. at 430.

Absent immunity, the specter of litigation could undermine prosecutors' ability to exercise their independent judgment with respect to the initiation and conduct of criminal proceedings. *See id.* at 422-28. In essence, the existence of the doctrine of absolute prosecutorial immunity represents a determination that the need for "vigorous and fearless performance of the prosecutor's duty," *id.* at 427, justifies its regrettable but necessary cost, namely, that it may sometimes bar the courthouse door to potentially meritorious claims. We decline to adopt an exception to the doctrine of prosecutorial immunity that upsets that balance.

### C.

Cousin also challenges Berry's and Jordan's allegedly unlawful use of subpoenas to interrogate several potential witnesses. Even if these individuals were unlawfully forced to discuss the case with the prosecution, however, Cousin, at most, has alleged a violation of their constitutional rights, not his own. Although Cousin's constitutional rights may have been violated by Berry's and Jordan's subsequent decision to suppress exculpatory evidence obtained through the use of these subpoenas, the suppression of exculpatory evidence is shielded by absolute immunity, as we have discussed.[13]

### D.

Cousin's final claim of prosecutorial misconduct relates to the alleged detention of several defense witnesses. Cousin contends that during trial, Barry and Jordan, without informing the defense, either directly or through intermediaries, instructed several defense witnesses to proceed to the district attorney's office and remain there for the duration of the trial. Cousin further avers that, as a result of such interference, he was unable to locate those witnesses and present their testimony, depriving him of the right to call witness on his own behalf, a right that has "long been recognized as essential to due process." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).

The district court held that this conduct, occurring as it did during the trial, was prosecutorial in nature and therefore shielded by absolute immunity. Cousin contends the court erred and that, despite the pendency of a judicial proceeding, the relocation of the witnesses was administrative action to which absolute prosecutorial immunity does not apply.

Cousin correctly notes that, because the test for absolute immunity is functional rather than temporal, the mere fact that prosecutors engage in certain conduct during trial should not render them immune. What Cousin fails to acknowledge, however, is that the timing of events, while not determinative, can be highly

---

[12] *See Kerr v. Lyford*, 171 F.3d 330, 337 (5th Cir. 1999) (citing *Stump v. Sparkman*, 435 U.S. 349, 356-57 (1978)).

[13] *See Henzel*, 608 F.2d at 657; *see also Reid*, 56 F.3d at 336; *Robinson*, 940 F.2d at 1373 n.4.

9

relevant to the inquiry into function.[14] The pendency of a judicial proceeding is logically related to the determination whether a prosecutor's "activities [are] intimately associated with the judicial phase of the criminal process, and thus [are] functions to which the reasons for absolute immunity apply with full force." *Imbler*, 424 U.S. at 430.[15]

The question of absolute immunity therefore turns on whether, given the pending criminal trial, Berry and Jordan undertook the detention of these witnesses pursuant to their role as advocates. Because their conduct was directly related to the trial process, was entered into in the context of an ongoing trial, and was designed to secure a conviction, it cannot be characterized as anything other than advocatory. Therefore, the detention of witnesses to prevent them from testifying in criminal proceedings, while unlawful and improper, is nonetheless shielded by absolute immunity.[16]

---

[14] *See Buckley*, 509 U.S. at 274 (considering stage of criminal justice process in determining functional characterization of the conduct); *see also Carter v. Burch*, 34 F.3d 257, 263 (4th Cir. 1994) (considering pendency of judicial proceedings in making immunity determination).

[15] *See Hill*, 45 F.3d at 662 (immunity applicable because conduct occurred "after the prosecutorial phase of the case had begun"); *Carter*, 34 F.3d at 263 (holding pendency of post-conviction judicial proceedings relevant to immunity determination); *see also Milstein*, 257 F.3d at 1011 (holding conduct unprotected because it occurred before empanelment of grand jury or determination of probable cause).

[16] *See House v. Belford*, 956 F.2d 711, 721-22 (7th Cir. 1992) (finding prosecutor entitled to absolute immunity where he denied that he had in- (continued...)

This result comports with our treatment of other improper attempts to control witness testimony and the presentation of evidence at trial.[17] Further, the contrary rule would have the anomalous result of extending absolute immunity to the prosecutor who silences a witness through coercion or intimidation, *Brandley*, 64 F.3d at 201, but denying it to the prosecutor who achieves the same result through deceit.

IV.

Cousin challenges the summary judgment for Connick that was based on qualified immunity. We review a summary judgment *de novo*. *Green v. CBS Broadcasting, Inc.*, 286 F.3d 281, 283 (5th Cir.), *cert. denied*, 123 S. Ct. 132 (2002).

Even when viewed in the light most favorable to Cousin, the evidence does not raise a genuine issue of material fact. To succeed on his claim of failure to train or supervise, Cousin must demonstrate that "1) the [defendant] failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir.

---

[16](...continued)
structed deputy to bar courtroom to defendant's family and potential witnesses); *cf. Brandley*, 64 F.3d at 201 (holding that prosecutor retained absolute immunity despite allegations of witness intimidation in attempt to suppress testimony).

[17] *Brandley*, 64 F.3d at 201 (witness intimidation); *Henzel*, 608 F.2d at 657 (suppression of exculpatory evidence and introduction of perjured testimony).

10

2001). To satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is "obvious and obviously likely to result in a constitutional violation. *Id.*

Cousin's evidence is insufficient to create a genuine issue of material fact as to whether Connick's alleged failure to sufficiently enforce the office's *Brady* policy constituted deliberate indifference to the violation of constitutional rights. As evidence of a pattern of constitutional violations, Cousin relies primarily on cases in which courts have found that prosecutors under Connick's supervision failed to disclose exculpatory evidence as required by *Brady*. The district court noted that Connick's office handled tens of thousands of criminal cases over the relevant time period, and we agree with the court's conclusion that citation to a small number of cases, out of thousands handled over twenty-five years, does not create a triable issue of fact with respect to Connick's deliberate indifference to violations of *Brady* rights.[18]

In any event, Cousin also failed to demonstrate that the training or supervision obviously was inadequate and plainly would result in violations of constitutional rights. As Cousin concedes, Connick's policy and training program was adequate. Therefore, it is his failure to impose sanctions on prosecutors responsible for *Brady* violations that must be shown to render his supervision inadequate.

Connick's enforcement of the policy was not patently inadequate or likely to result in constitutional violations. Where prosecutors commit *Brady* violations, convictions may be overturned. That could be a sufficient deterrent, such that the imposition of additional sanctions by Connick is unnecessary.

Further, prosecutors exercise independent judgment in trying a case, and they have the legal and ethical obligation to comply with *Brady*. It is not apparent that these prosecutors, who, Cousin concedes, are adequately trained with respect to *Brady* requirements, are so likely to violate their individual obligations that the threat of additional sanctions is required.

AFFIRMED.

---

[18] On this point, Cousin also points to statements by Connick and other attorneys with respect to *Brady* rights, an open letter from a judge to the office of the district attorney expressing concern over its discovery practices, and evidence that Connick promoted Jordan despite Jordan's prior *Brady* violations. Even taken together, these pieces of evidence do not create a genuine issue with respect to a pattern of *Brady* violations sufficient to establish deliberate indifference.